R. W. SCOTT v. THE STATE.

No. 2359. Decided March 25, 1902.

**1.—Jurisdiction—Commencement of Term of Court—Absence of Judge—Statute Construed.**

Article 1071, Revised Statutes, provides that if the district judge is absent on the day appointed for the term of court, a special judge shall be elected by the attorneys in attendance. Held, the statute evidently allows the whole of the first day of the term in which the judge may appear and open the court; and the contingency for an election of a special judge by the attorneys only occurs on the ensuing day. Where the judge did not appear until the second day, no election having been held in the interim, the court was properly convened and held by said judge, and an indictment found at said term was legal and supported his jurisdiction.

**2.—Continuance for Impeaching Testimony.**

Where a continuance is sought for testimony which is at most of an impeaching character, continuances are not usually granted.

**3.—Murder—Charge—Express Malice.**

On a trial for murder, where there was no testimony showing a disregard of life generally, a charge defining express malice, in connection with such reckless disregard of human life, is not erroneous where the malice proved was directed against deceased and the killing manifested a reckless disregard of his life.

**4.—Same—Incorrect Charge—Harmless, When.**

On a trial for murder, an incorrect charge as to express malice becomes harmless where defendant was acquitted of murder in the first degree.

**5.—Same—Charge Favorable to Defendant.**

On a trial for murder, defendant should not be heard to complain of a charge which, although it might be upon the weight of testimony, was only in his favor; as, for instance, where the homicide was committed with a deadly weapon and there was no issue as to his intent in using it, an instruction was favorable to him which told the jury that "if the instrument be one not likely to produce death, it was not to be presumed that death was designed."

**6.—Same—Manslaughter—Charge—Adequate Cause.**

On a trial for murder, where the cause relied upon to reduce the offense to manslaughter was not a statutory adequate cause, a general charge upon manslaughter was sufficient, and the court was not required to recite, in the charge, the facts suggesting the adequate cause.

**7.—Misconduct of Jury—Discussing Part of Testimony Before the Evidence Was Concluded.**

While it would always be best for a jury to defer their discussion of the testimony until they have heard all of it and received the charge of the court, still there is no rule authorizing a reversal simply because they discussed a portion of the testimony before they had heard all that was to be adduced.

**8.—Same—Affidavits of Jurors.**

It is not competent for jurors to make affidavits as to their discussions of the testimony, or as to the opinions entertained by them in regard to the testimony of witnesses.

Appeal from the District Court of Callahan, on a change of venue from Scurry County. Tried below before Hon. N. R. Lindsey.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of W. C. Haley, in Scurry County, on the 16th day of August, 1901, by shooting him with a pistol.

The parties were living upon and occupying parts of the same section of land, and the difficulty, which finally culminated in the homicide, originated with regard to the fences dividing their respective tracts; and especially with regard to the access of defendant's stock for water to a waterhole in a branch or creek near the dividing line of fence, which waterhole was inside the inclosure of deceased. There had been a partial agreement as to the use by defendant of this waterhole, but deceased finally refused to let defendant have further access to it, and closed up the opening in the fence through which defendant's stock went to the water. Defendant tore down this portion of the fence and his stock went into the deceased's inclosure. Deceased and Burt Burford went to drive out the stock and put up the fence.

Burt Burford was the only eyewitness present at the killing, and his testimony, fully and as far as it developed the State's case, is as follows: "The defendant, R. W. Scott, shot and killed Mr. Haley about 8 o'clock a. m., August 16, 1901, in said county and State. The place of the killing is situated about 150 yards south of east from the defendant's house, at the west line of the Haley pasture. On the day before the killing, Mr. Haley (the deceased) came to me and told me that he was going to put up some fence and wanted me to help him, saying that he had gotten the Baldridge boys to help him also. On the morning of the killing I went over to Mr. Haley's house to help him build the fence, and as soon as we got ready Mr. Haley told me to take the crowbar and hammer, which I did, and started over to where the fence was down at the place of the killing. Mr. Haley got on his mare and went south of the house and rounded up the defendant's horses and mules and drove them back by the house and on around the north point of the thicket, and came on rather in front of me and called to me to wait and let the stock get ahead. I did so, and when they got in front of me I came in behind them and helped Mr. Haley drive them up to the fence. The fence was down at this place for about fifty yards; two posts had been pulled up, I guess, and the stock all went across the wire where it was down except one mule, which turned rather south up the fence. Mr. Haley rode around it and turned it back and it crossed over the wire; and Mr. Scott, having come down from his house, at this time was standing just outside of the fence. Mr. Haley, when this last mule went over the wire, was riding in a north-

west direction and towards where Mr. Scott was standing. As the mule went over the wire, Mr. Haley said, 'Howdy, Mr. Scott?' and Mr. Scott said 'Howdy, Mr. Haley?' I said 'Howdy, Mr. Scott?' and he said, 'Howdy?' all about the same time. Then Mr. Scott said to Mr. Haley, 'I wish you would let my stock alone.' Mr. Haley answered, 'I wish you would let my fence alone.' Mr. Scott then drew his pistol and fired at Mr. Haley, who had gotten off his horse, and I thought the shot had struck him in the face. I did not see Mr. Scott take the pistol out; the first I saw of it, it was in his hands and he cocked it, presented it at Mr. Haley, and fired. Just before he fired, Mr. Haley said, 'Give me some show.' After he fired the first shot he immediately fired a second shot at Mr. Haley, and Mr. Haley said, 'I am dead,' and fell to the ground. After the first shot and before the second shot, Mr. Haley said again to Mr. Scott, 'Oh, give me some show.' Mr. Haley was not armed at the time; he was in his shirt sleeves, and had no gun or weapon of any kind that I knew anything about. He did not offer to use any weapon at all. When Mr. Haley fell, I ran as fast as I could in an easterly direction towards Mr. Haley's house. As I ran I looked back and saw Ben Scott running after me with a shotgun, and Mr. Scott had gotten on Mr. Haley's horse and was pursuing me also. They ran me about 150 yards, I guess; saw them when I looked back. I ran on over to Mr. Haley's house and told of the trouble."

This witness testified that after he got to the house, he got a Winchester gun belonging to Mr. Birdwell, a son-in-law of Haley, and about this time, Birdwell having come up, he gave the gun to him and he carried it to the place where Haley's dead body was lying. All the State's witnesses testified that Haley was unarmed when he was killed.

Birdwell testified that after he reached the dead body he laid the Winchester gun down near the body, and that when he left to assist in taking Mrs. Haley (who was at the dead body) back to her house, he left the Winchester at the spot where he had left it, near the body.

Defendant's witnesses testified that the Winchester gun was lying near the body of deceased before any of his family or Birdwell reached there. Defendant, as a witness in his own behalf, testified that Haley had the Winchester at the time of the difficulty, and that he fired the same at him before he shot, and that he had grabbed and had hold of the Winchester gun when he killed Haley.

The questions discussed in the opinion need no further statement.

*Jenkins & McCartney* and *W. J. Scott,* for appellant.—The court not having convened when authorized by law, could not convene on a subsequent day.

The day fixed by law for the District Court of Scurry County to convene at the September term, 1901, was the second Monday after the first Monday in September, which was the 16th day of said month. The judge of said court was not present on said day, and no special judge was

elected, but the sheriff adjourned said court until the 17th day of September, on which day the judge of said court being present, said court was convened, and the grand jury which returned the indictment herein was impaneled. Wilson v. State, 37 Texas Crim. Rep., 381; Const. of Texas, art. 1, sec. 10; Doss v. Wagoner, 33 Texas, 516; Womack v. Womack, 17 Texas 2; Hunter v. Nichols, 55 Texas, 224; Campbell v. Chandler, 37 Texas, 32; People v. Sullivan, 115 N. Y., 185, 21 N. E. Rep., 1040; Northrup v. People, 37 N. Y., 203; People v. Bradwell, 2 Cow., 447.

The court erred in overruling the defendant's motion for a new trial in this: Said motion showed that said witness Mrs. B. Taylor had been duly subpoenaed as a witness in defendant's behalf in time to have appeared and testified upon the trial hereof, and was prevented from attending said trial and testifying herein on account of sickness, and upon the trial hereof it appeared that the testimony of said witness was material to the defendant's defense, and was probably true, in this: Mrs Sallie Quinn testified upon the trial of this cause that she ran to the body of said Haley immediately after the killing and saw a Winchester gun lying on the ground near his feet. The truth or falsity of this statement was the real issue in this cause. Appellant testified that Haley fired at him with a Winchester. State's witness Burford, who was present, testified that Haley was unarmed. If he had a gun, the killing was in self-defense. If he had no gun, the killing was murder. There was considerable testimony both in support and in rebuttal of the fact that Haley had a gun. All of the evidence in support of this proposition came from appellant and his children, except the testimony of his daughter-in-law, Mrs. Quinn. The State contradicted Mrs. Quinn by Mrs. Bullock. But Mrs. Bullock's testimony shows that she is a partisan for the prosecution, and has probably fabricated her testimony by slightly changing what Mrs. Quinn really did say. In this state of the case, the State corroborated Mrs. Bullock by the testimony of her son Jesse Bullock, who shows no particular bias in the case. It was alleged in said motion that Mrs. Taylor would testify that the witness Jesse, at her house, a few weeks after the killing, told her that he heard a rumor to the effect that appellant's women folks (including Mrs. Quinn) had stated, at the time and place as testified by Mrs. Bullock herein, that they saw no gun near the body of Haley immediately after said killing, but that said report was false, and that they (including Mrs. Quinn) made no such statement at said time and place.

The court erred in his charge in giving the following definition of express malice, to wit: "Or do the facts and circumstances in the case show such a reckless disregard of human life as necessarily includes the formed design to take the life of the person slain." There being no evidence upon which this charge could legally be predicated, but there being sufficient evidence in this regard to mislead the jury to defendant's prejudice.

The charge of the court should be applicable to and limited by the

facts. The facts show a previous disagreement between appellant and deceased as to their rights of possession of a tract of land. That they met on the morning of the killing, and that appellant, either in self-defense or on account of ill will engendered against deceased in driving appellant's stock off the land in controversy, with the evident purpose to put up the fence which appellant had torn down, shot the deceased. If the latter, and there were not such circumstances as reduced the killing to manslaughter, the killing was upon malice against the deceased. This is putting the case in the strongest possible attitude for the State. From the State's evidence it might be said that appellant manifested a purpose to take the life of deceased without legal justification, but there can be no pretense that he manifested an utter disregard of human life in general, nor indeed any disregard of the life of anybody except that of deceased and of his companion, Burt Burford, at whom defendant says he shot in self-defense.

The court erred in failing to charge upon the law of manslaughter in connection with the defense of property, the evidence showing that deceased was trespassing upon the property rights of the defendant at the time of the killing.

The court should charge the jury upon every phase presented by the facts of the case The undisputed evidence was that appellant claimed both the possession and right of possession of all of section 183, and that Haley denied such right of possession as to the east half of said section, and at the time of the killing was attempting to exclude the appellant from the possession of said land by forcibly driving his stock therefrom, and was preparing to forcibly put up a fence inclosing said land. Appellant verbally requested the court to charge upon these phases of the case, and specially excepted to the failure of the court to so charge. Sims v. State, 36 Texas Crim. Rep., 165 to 172; Milrainey v. State, 33 Texas Crim. Rep., 593; Ledbetter v. State, 26 Texas Crim. App., 33; Gilcrease v. State, 33 Texas Crim. Rep., 630. Upon right to have affirmative charge Mueley v. State, 26 Texas Crim. App., 302; McLaughlin v. State, 10 Texas Crim. App., 357.

*Rob't A. John,* Assistant Attorney-General, for the State. [No briefs for the State found with the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years; hence this appeal.

Appellant's first proposition is with reference to the jurisdiction of the court; it being insisted by him that the term fixed by law for holding court in Scurry County was the 16th day of September, 1901, the same being Monday; and that the judge did not appear on said day; that he only put in an appearance on Tuesday, the 17th, and that no court was begun and holden on the 16th, under article 1071, Revised Civil Statutes, providing for the election of a special judge on the failure of the district

judge to appear. The record shows in this respect as follows: That on September 16, 1901, there was begun and holden a regular term of the District Court of Scurry County, Texas. W. E. Ponder, district attorney; A. J. Grantham, district clerk, and L. C. Darby, sheriff were present. Hon. P. D. Sanders, judge of said court, not being present, the court was called by the sheriff and adjourned until Tuesday, the following morning, at 10 o'clock. The minutes then proceed, that on Tuesday, September 17, 1901, the court convened with the same officers present as on yesterday, with Hon. P. D. Sanders presiding. Whereupon, etc. Appellant cites us to Wilson v. State, 37 Texas Criminal Reports, 373; Campbell v. Chandler, 37 Texas, 32; People v. Sullivan, 115 New York, 185, and a number of other cases in support of his contention. In Wilson's case on the first motion for rehearing, it was held that the case was not tried at a term of court, and the judgment was reversed on that account. Subsequently, however, on the second motion for rehearing, this action of the court was reversed on the ground that the recent act of the Legislature failed to provide two terms of the district court, and that said act was void; and that the court rightly held as of the old term, and the conviction was accordingly maintained. The facts of that case on the first motion for rehearing, as recited in the judgment, are very different from those here presented. There we held that the recent act providing a new time for holding the court was legal. The court should have met under that act on June 3, 1895. There was no showing of any attempt on the part of the court to hold the term until June 24, 1895, which was under the former law; so that there was a lapse of the term under the new law between the time of beginning the court and the time when it actually began, of twenty-one days. Here there was an interval of only one day between the beginning of the term and the actual presence of the judge. The terms of court are fixed by law, and it is well settled that there can be no court without the presence of the judge. He may not alone constitute the court, but he is an essential part thereof. 8 Am. and Eng. Enc. of Law, p. 22, and authorities there cited. It has also been held that the court must begin on the day fixed by law therefor; and if the judge is absent on that day, unless there is some enabling act, the term will lapse. People v. Bradwell, 2 Cow., 445; People v. Sullivan, 115 N. Y., 185; In re Terrell, 52 Kan., 29, 39 Am. St. Rep., 327. Followed in In re McClaskey, 34 Pac. Rep., 459; State v. Roberts, 8 Nev., 239; People v. Sanchez, 24 Cal., 17. As stated before, the question here presented requires a construction of article 1071, Revised Civil Statutes, 1895. That article provides, that whenever on the day appointed for a term of the district court the judge thereof shall be absent, or shall be unable or unwilling to hold the court, there shall thereby be no failure of the term, and no failure to proceed with the business of the court, but the practicing lawyers of such court present thereat may proceed to elect from their number a special judge of said court, who shall proceed to hold said court, etc. Now, a proper interpretation of this statute allows the whole of the first day of the term in which the judge may put

in an appearance and open the court. If he does not put in an appearance during the first day, then, in order to keep the term alive, the attorneys in attendance on the court may meet on the ensuing day and elect a special judge and so prevent a failure of the term; or it would follow if before they meet on the second day, the judge puts in an appearance and opens court, there is no lapse of the term. The statute evidently accords the judge the whole of the first day within which to make his appearance and open court; and the contingency does not arise during the first day when the attorneys in attendance on the court would be required to act in order to prevent a failure of the term. Of course it is not necessary to discuss whether or not if they had acted on the first day of the term such action would be illegal. It is only necessary to discuss the question whether or not there was a lapse of term under the facts as shown in the record. We hold there was not. People v. Sanchez, 24 Cal., 17. Nor do we understand anything in this decision to militate against the views expressed in Wilson v. State, supra.

Appellant made a motion to continue the case on account of the absence of Mrs. B. Taylor. Waiving the question of diligence, it does not occur to us that her testimony was material; that is, at most it was impeaching testimony, and continuances are not usually granted on said account. Appellant alleges that he expected to prove by said witness that Jesse Bullock, a witness for the State, stated to said witness at her house several weeks after W. E. Haley was killed, that none of defendant's family had stated, at his father's house on the day that said Haley was killed, that they did not see a gun or firearms of any description near the body of deceased immediately after said killing. And in that connection appellant stated he anticipated the State would prove by said Jesse Bullock that he did hear some of the members of defendant's family say that they did not see a gun or firearms of any description near the body of said Haley after he was killed. It will be noted in connection with this statement of the application that no particular witness is pointed out whom Bullock should prove he heard make the statement. It is general, and seems to apply to the whole family, to the effect that he had heard none of them make such remark. However, conceding that a predicate for impeachment is sufficiently laid, as stated before, the testimony is merely of an impeaching character, and we see nothing in this case to take it out of the ordinary rule.

. Appellant excepted to the charge of the court on express malice or rather to that portion of the charge in which the court used the following language: "Or do the facts and circumstances in the case show such a reckless disregard of human life as necessarily includes the formed design to take the life of the person slain." He insists that there is no testimony showing on the part of appellant an utter disregard of human life, which would indicate express malice, and that consequently the court should not have charged thereon. This language occurs in the court's definition and illustration of what it took to constitute express malice,

and among other things, speaking generally he used the language suggested. Accurately speaking, there is no testimony showing a reckless disregard of human life, such as is illustrated by one firing into a crowd. But it occurs to us, if appellant's theory as to the homicide is not correct, and the State's was correct, appellant in killing did manifest a reckless disregard of the life of the person slain; rather his malice was more acute than this. But here the malice was directed against the particular person, and manifested an utter disregard for his life. Besides this, the jury acquitted him of murder in the first degree; and even if it be conceded 'that this charge, in defining express malice, was not correct, yet we fail to see how it harmed appellant. Appellant also complains of the following language of the court's charge on implied malice, to wit: "If the instrument be one not likely to produce death, it is not to be presumed that death was designed." He objects to this, because, he says, it is a charge on the weight of testimony. If it is, it occurs to us that it is favorable to appellant. However, there could be no controversy as to appellant's intent to slay deceased. He used a six-shooter, a deadly weapon, and used it with deadly effect. His intent and purpose was not an issue in the case, except that he claimed what he did was in self-defense. But the charge is not an infringement of his rights in this respect. Appellant further insists that the court erred in failing to instruct the jury in regard to appellant's right to defend his property in connection with the court's charge on manslaughter. We do not concur with the view that the homicide involved the protection of appellant's property, under articles 677 and 680. True, the parties were having an altercation, which had been pending for some time in regard to their lands and fences, and the difficulty appears to have grown out of this. On the morning of the homicide it appears deceased and his companion were engaged in driving appellant's stock off the land in controversy between them, preparatory to putting up a fence which deceased had previously erected and which had been torn down by appellant on the preceding night. As deceased drove the stock across the fence, appellant approached with a gun, an altercation ensued, and appellant shot deceased. Now all this testimony, involving the cause of the difficulty between the parties, was before the jury, and the court gave a very full and clear charge on manslaughter. While he told the jury, that the provocation must arise at the time of the commission of the offense, that the jury could also look to all the facts and circumstances antedating that event, and if they found that adequate cause existed, and appellant's passion was thereby engendered, and he slew deceased, not in self-defense, that they could not convict him of a greater crime than manslaughter. The jury certainly understood this charge to embrace all that transpired between the parties, especially the driving out of appellant's stock by deceased and all that there transpired. We do not think it was incumbent on the court to do more than was done by the charge on the subject. We do not understand it to be the rule that, outside of the statutory causes, it is incumbent on the court to embrace or recount the facts which may

suggest adequate cause, but, under the general charge, these matters which may constitute adequate cause are left to be determined by the jury. Complaint is made to the action of the judge in regard to the introduction of certain impeaching testimony against Meadow, one of appellant's witnesses. The imputation suggested is that the judge, in the presence of the jury, pointed out to counsel the impeaching testimony. In the bill as approved by the judge there is nothing reprehensible; on the contrary, his conduct was entirely proper. The habeas corpus testimony was handed him, and he merely looked at it and handed it back to counsel without any remark calculated in anywise to indicate any impropriety.

In the motion for new trial appellant raises the question as to the misconduct of the jury. He insists that the jury discussed some of the testimony before the evidence was finally concluded and the case submitted to them by the court. And in this connection some of the jurors were examined, and it appears that mention was made by some of the jury with reference to some of the testimony. While it would always be best for a jury to wait until they had heard all the testimony, and then receive the charge of the court before they begin to discuss the evidence, and the application of the law thereto, still we know of no rule which would authorize a reversal of a case simply because the jury may have discussed or remarked about the testimony of some witnesses before the final conclusion of the evidence. Counsel has referred us to no case in support of his contention, and we do not believe there is any. Nor do we believe it competent for jurors to make affidavits as to their discussion of the testimony in the case, or as to the opinions entertained by them in regard to the testimony of witnesses. Hodges v. State, 6 Texas Crim. App., 615; Thomas v. Zushlag, 25 Texas Supp., 229; Weatherford v. State, 31 Texas Crim. Rep., 530; Pilot v. State, 38 Texas Crim. Rep., 515. We do not regard the motion for new trial as setting up such a case of misconduct on the part of the jury as affords a ground for reversal.

We have examined the record carefully, and in our opinion the evidence fully justified the jury in rendering their verdict. There being no error in the record, the judgment is affirmed.

*Affirmed.*

[Note.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]