# ROBT. HENDRICK v. STATE.

No. A-9263.   Oct. 29, 1937.

(73 P. 2d 184.)

Crump & Carver and Hill & Hill, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Tom Huser, Co. Atty., for the State.

BAREFOOT, J. The defendant was charged by information with the crime of murder, was tried, convicted of manslaughter in the first degree, and his punishment assessed at a term of seven years in the penitentiary. From this judgment and sentence he has appealed to this court.

It is the contention of the defendant that the court erred in the giving of two instructions, Nos. 11 and 14, and that the court erred in failing to give two requested instructions. Instructions Nos. 11 and 14 are as follows:

"No. 11. If you believe from the evidence or have a reasonable doubt as to whether it reasonably appeared to the defendant, situated as he then was, and that he honestly believed that his father, or himself, was in imminent danger of losing his life or receiving great bodily injury and that he fired the shot to protect his father from the threatened danger, then the shooting would be a lawful one, and it would be your duty to acquit the defendant, unless you believe from the evidence beyond a reasonable doubt that they entered voluntarily into the difficulty, one of them armed with a deadly weapon at the time."

"No. 14. In this connection you are told that self-defense, under the law, is a defensive and not an offensive act, and for a person to avail himself of a plea of self-defense, in order to justify a killing, it must reasonably appear to him at the time of the killing that the act upon the part of the deceased, by which the defendant seeks to justify the killing, was such an act as made it reasonably to appear to him at the time that he, or some member of his family, was in danger of losing his, or their life, or of great personal injury being done him or them, and it is the duty of a person so threatened with danger to his life or of great personal injury being done him, or some member of his family, to use at the time all reasonable

means apparent to a reasonable person under the circumstances to avoid such danger before the taking of human life, except that he is not bound to retreat to avoid such necessity, or apparent necessity of killing, provided he, or member of his family so threatened, has done no act upon his part to bring about the attack, or threatened attack, if any, by the deceased."

The requested instructions were as follows:

"No. 1. You are instructed that the undisputed evidence shows that this controversy arose over the possession of 40 acres of land which the defendant's father and the deceased had rented from William Coker, and that the defendant, Ed Hendrick, the father of Robert Hendrick, had the undisputed possession of the land during the year 1934 and up to about the 1st day of April, 1935, at which time the deceased claimed to have rented said 40 acres of land from William Coker, and in this connection you are instructed that if you believe from the evidence or entertain any reasonable doubt thereof that Ed Hendrick, the father of this defendant, rented said 40 acres of land for the year 1934 and did not surrender possession of the same to his landlord or any one else and had no written notice to vacate said land from his landlord and held over from the spring of 1934, that his possession was a peaceable one, and that Ed Hendrick and his son, Robert, defendant in this case, had a right to remain in possession of said land against the aggression of the said Walter Poole, and had the right to use all force that reasonably appeared necessary to them at the time of the homicide to protect said possession against the aggression of the deceased and to repel any attack made by the deceased by the use of force, providing that said force so used was reasonably necessary to protect the possession of said land and the person of the defendant or his father.

"No. 2. You are further instructed that if you believe from the evidence or entertain any reasonable doubt thereof that Ed Hendrick, the father of this defendant, had had possession of the 40 acres of land over which this controversy arose and that he was upon said land the day

of the homicide, he was in a place where he had a right to be, and if you further believe from the evidence that Walter Poole and his wife voluntarily came on the place where the homicide occurred and that Walter Poole was armed with a deadly weapon, a claw hammer and a pair of wire cutters, and began to cut the wire, and with said hammer and gun approached the defendant and his father in a threatening manner and by the use of said gun and hammer led the defendant, Robert Hendrick, to believe that his father was in danger of death or great bodily harm, he fired the shot to prevent such danger, it will be your duty to find the defendant not guilty."

Defendant, in his brief, discusses the two instructions given by the court together. He does not complain of the first part of instruction No. 11, but the closing sentence "unless you believe from the evidence beyond a reasonable doubt that they entered voluntarily into the difficulty, one of them armed with a deadly weapon at the time." He claimed this was error in view of the facts and circumstances in this case; his contention being that this part of the charge deprived the defendant of his right of self-defense and was applying "the law of mutual combat" to the facts in this case. This charge should be analyzed in connection with all of the instructions given by the court and the evidence received. The evidence revealed that the defendant and his father, Ed Hendrick, were jointly charged with the murder of Walter Poole, alleged to have been committed in Seminole county, on the 16th day of April, 1935. Ed Hendrick was tried and acquitted, and defendant was tried and convicted. Defendant's defense was that he shot the deceased, who was at the time in conflict with his father, Ed Hendrick, and that the killing was in defense of his father, whom he thought was in danger of death or great bodily harm at the hands of the deceased.

The facts further reveal that Ed Hendrick, during the year 1934, had leased and used 40 acres of pasture land belonging to one William Coker. This land was used as pasture for the cattle of Ed Hendrick, and joined an 80-acre tract of which he was in possession. This 40-acre tract also joined land which was the property of the deceased, Walter Poole, who claimed to have rented the 40 acres from William Coker for the year 1935. A controversy and hard feelings had arisen between these parties over the possession of this land, and a few days before this difficulty occurred, deceased had driven the cattle of Ed Hendrick from these premises and the said Ed Hendrick had replevined said cattle from the deceased. Both parties had consulted attorneys in connection with their respective rights. On the morning of the difficulty, April 16, 1935, the father of defendant and a colored man took a wagon and went to the 40-acre tract where the deceased had made a gate. This gap was closed and wired up and a tree cut and allowed to fall across the same. This was done for the purpose of keeping deceased from taking possession of the cattle again. Ed Hendrick, when he left his home on this morning, carried with him, in his wagon, a loaded shotgun. The colored man who went with him was not present at the scene of the difficulty. The defendant, Robert Hendrick, was not at home when his father left, but upon his arrival was informed where his father was and left immediately to meet him. Soon after his arrival the deceased and his wife came to the scene of the difficulty. He at the time having a double-barreled shotgun, a claw hammer, and a pair of pinchers. Immediately after his arrival a controversy was started and deceased cut several strands of wire. Both parties had shotguns, and upon demonstrations being made, the wife of deceased grabbed his gun and the defendant grabbed

the gun of his father, Ed Hendrick. Up to this point there is very little, if any, conflict in the testimony. The evidence of the wife of the deceased was that he was killed by defendant while he was unarmed and in no way attempting to harm the defendant or his father. The evidence of the defendant and his father was that the deceased was attacking Ed Hendrick with a claw hammer, had struck him, and that he was on the ground at the time the defendant shot deceased.

Evidence of others who arrived soon after the difficulty supports the view of each of the parties. One disinterested party testified that the claw hammer was still in the pocket of the deceased after he was shot; another testifying it was found on the ground near the body of deceased; the evidence being highly conflicting as to who was the aggressor at the time of the fatal difficulty.

The jury, after hearing this conflicting evidence, seeing and observing the witnesses on the stand, and hearing the charge of the court, which when carefully read protected the rights of the defendant, found the defendant guilty. This being true, it is not for this court to say that the verdict of the jury was contrary to the evidence. The argument of the defendant that the last part of instruction No. 11 took away from him the right of self-defense overlooks the fact that one killing in alleged defense of another cannot set up a defense not available to such other person. His father had gone to the scene of the difficulty armed and evidently expecting trouble. At the first appearance he had the gun in his hands and it was taken away from him by defendant. The court, under the law, properly instructed the jury that if they believed from the evidence or had a reasonable doubt as to whether it reasonably appeared to the defendant, situated as he then was, that he honestly believed that his

father or himself was in imminent danger of losing his life, or of receiving great bodily injury, and that he fired the shot to protect his father from the danger, then the shooting would be a lawful one, and that it was their duty to acquit the defendant, unless they believed from the evidence beyond a reasonable doubt that he or his father entered voluntarily into the difficulty, one of them being armed with a deadly weapon at the time. This court, in the case of Moore v. State, 25 Okla. Cr. 151, 219 Pac. 175, has passed upon this proposition in the following language:

"The right of one to defend another is coextensive with the right of the other to defend himself, and one who intervenes in a difficulty between others must accept all the responsibilities and liabilities of the person for whom he intervenes. If one fires a fatal shot in defense of his son, he is justifiable or not according as the son would be innocent or guilty had he fired the shot in his own defense."

This instruction, together with instruction No. 14, above quoted, should be considered in connection with other instructions given by the court. In instruction No. 9, it is provided:

"A person who is unlawfully attacked, or some member of his family is unlawfully attacked, is not bound to retreat to avoid the necessity of injury to the assailant, or of killing him, when it reasonably appears necessary to save his own life, or the life of some member of his family, or to avoid serious bodily injury to himself or member of his family from the person killed. The killing under such circumstances will be self-defense and it is not necessary to the right of self-defense that the danger should in fact exist, and, if it reasonably appears from the circumstances of the case that danger exists, the person threatened with such apparent danger, or member of his family, has the same right to defend against it, and

to the same extent, that he would have were the danger real."

Instruction No. 10 provides:

"When an attack has been made by one person upon another and the person making the attack is killed, in determining whether the killing is justifiable, the nature and purpose of the attack, the existence of or appearance of danger and extent thereof, the amount or degree of force necessary and sufficient to be used to avoid the apparent or threatened danger, and all of the facts and circumstances in the case must be viewed and considered from the standpoint of the defendant, at the time of the killing, and from no other standpoint, and if, when viewed from the standpoint it reasonably appears that the killing was necessary to prevent death or great bodily harm to the defendant, or member of his family, the killing will be justifiable."

Instruction No. 13 provides:

"You are further instructed that if you believe the defendant, under all the facts and circumstances as they reasonably appeared to him, had reasonable grounds to believe and did believe that he, or some member of his family, was in great danger of losing his, or their life or of receiving great bodily injury from the deceased at the time of the homicide, then in that event you are told that he had a right under the law to use such force as reasonably appeared to him under all the facts and circumstances to be necessary to repel such attack, and you are instructed that if, under such circumstances the killing took place, it would be justifiable."

Instruction No. 20 provides:

"If you believe, or have a reasonable doubt thereof, that at the time of the fatal difficulty that the deceased, without any act upon the part of the defendant, or of his father, showing a purpose to do bodily harm to the deceased, did then and there by some act upon his part then done, make it reasonably to appear to the defendant,

viewed from his standpoint, that it was then and there the purpose of the deceased to assault him, or his father, or to do him or his father some personal injury, then in that event the defendant had a right to shoot the deceased, in his self-defense, or the defense of his father, if it was then and there necessary, or apparently necessary, for him to do so in his or his father's own proper self-defense; and, if he did so shoot and kill the deceased under these circumstances, then you are instructed that you should find him not guilty, and, unless you find beyond a reasonable doubt that the defendant unlawfully killed the deceased, you must return a verdict of not guilty."

From a reading of these instructions, it will be seen that the court was very considerate in protecting the rights of the defendant. The argument presented by the able brief filed by attorneys for the defendant in this case presents an argument that the jury could have well considered; but in view of the conflicting testimony it is not the province of this court to disturb the verdict when it has been adverse to the contention made by the defendant.

The two instructions complained of, when read in connection with the other instructions given by the court, and as applied to the facts in this case, fully protected the rights of the defendant. The rights of the defendant to act in defense of his father, if he as a reasonable person believed that his father was in danger of great bodily harm or death, were properly stated in several of the instructions above quoted. If his father had armed himself before going to the scene of the difficulty, and was ready and willing to enter into the conflict, as the evidence shows, then the defendant would be in no better position than his father, in claiming the right of self-defense. This is what the court instructed the jury in the last part of instruction No. 11. Wadsworth v. State, 9 Okla. Cr. 84, 130 Pac. 808; Weatherholt v. State, 9 Okla. Cr. 161, 131

Pac. 185; Driggers v. United States, 1 Okla. Cr. 167, 95 Pac. 612, 129 Am. St. Rep. 823; McDaniel et al. v. State, 8 Okla. Cr. 209, 127 Pac. 358.

Defendant, in his brief, contends that the facts in the case at bar are different from the facts in the case of McDaniel v. State, supra, in which case an instruction identical with No. 11 was approved by Judge Furman in that case. The defendant says:

"The evidence proves conclusively that defendant did not know that his father had a gun until he arrived at the scene of the homicide."

This argument overlooks the well-established rule of law that one killing in alleged defense of another cannot set up a defense not available to such other person.

It is next urged by defendant that the court erred in failing to give the two requested instructions above set out. These instructions are proper statements of law, but we do not think under the circumstances and the evidence in this case it was necessary for this issue to be presented to the jury in order that the rights of the defendant be protected. Under the evidence there was a conflict of opinion as to who had the right to the possession of this land. It is true the father of defendant had possession of the premises for the year 1934 but he had not leased the same for 1935. His lease expired January 1, 1935. It is true he had kept his cattle on the premises after the first of the year and was attempting to hold over after his lease of 1934 had expired, and that no written notice had been given him to vacate the property. This was a matter that could, and should, have been settled in the civil courts of this state. Both parties, however, seemed to be determined to settle it by conflict of arms. This was the reason they armed themselves and

went to the scene of the difficulty. Each thought himself entitled to the possession of the disputed land, and each regarded the other as a trespasser.

See Schmitt v. State, 57 Okla. Cr. 102, 47 P. 2d 199, and cases cited therein, for a full discussion of the principles here announced.

In Utterback v. Commonwealth, 105 Ky. 723, 49 S.W. 479, 482, 88 Am. St. Rep. 328, the court says:

"They could not settle this dispute by the arbitrament of arms. Life cannot be taken to prevent a trespass; and, on a trial for homicide, the guilt or innocence of the defendant does not depend upon whether he was right or wrong in the controversy about the land. Life, in cases like this, can only be taken in self-defense or in the necessary defense of others.   *   *   *

"In 1 Bish. Cr. Law, § 857, 858, the law is thus stated: 'The general doctrine is that while a man may use "all reasonable and necessary force to defend his real or personal estate, of which he is in the actual possession, against another who comes to dispossess him without right," he cannot innocently carry this defense to the extent of killing the aggressor. If no other way is open, he must yield, and get himself righted by resort to law. But the general doctrine as to the defense of property is not applicable to the defense of what is termed the "castle." In the early times our forefathers were compelled to protect themselves in their habitation, by converting them into holds of defense; and so the dwelling house was called a "castle." And thence has grown up the familiar doctrine that, while a man keeps the doors of his house closed, no other has the right to break in under any circumstances, except in particular cases, where it becomes lawful for the purpose of making an arrest of the occupant, or the like,—cases which it is not within our present line of discussion to consider. From this doctrine is derived another, namely, that the person within the house

may exercise all needful force to keep the aggressor out, even to the taking of life.'

"In the case at bar the difficulty occurred over a little strip of land remote from the dwelling house of either party, and neither could vindicate his rights as he conceived them to be by a breach of the peace, much less by the taking of human life. The question is not to be determined here, for neither party had the right to resort to firearms, unless life was then and there in danger, or great bodily harm apprehended. The right of the parties to the land can only be tried in a civil suit between them. The evidence to their respective claims is only admissible in this case to put the jury in the situation of the parties, so that the jurors may better judge as to their motives, and determine, where the evidence is conflicting, more intelligently as to their actions."

In Scott v. State, 43 Tex. Cr. R. 591, 68 S. W. 177, 179, the court says:

"Appellant further insists that the court erred in failing to instruct the jury in regard to appellant's right to defend his property in connection with the court's charge on manslaughter. We do not concur with the view that the homicide involved the protection of appellant's property, under articles 677 and 680. True, the parties were having an altercation, which had been pending for some time, in regard to their lands and fences, and the difficulty appears to have grown out of this. On the morning of the homicide, it appears deceased and his companion were engaged in driving appellant's stock off of the land in controversy between them, preparatory to putting up a fence which deceased had previously erected and which had been torn down by appellant on the preceding night. As deceased drove the stock across the fence, appellant approached with a gun, an altercation ensued, and appellant shot deceased. Now, all this testimony involving the cause of the difficulty between the parties was before the jury, and the court gave a very full and clear charge on manslaughter. While he told

the jury that the provocation must arise at the time of the commission of the offense, he charged that the jury could also look to all the facts and circumstances antedating that event, and if they found that adequate cause existed, and appellant's passion was thereby engendered, and he slew deceased not in self-defense, that they could not convict him of a greater crime than manslaughter. The jury certainly understood this charge to embrace all that transpired between the parties, especially the driving out of appellant's stock by deceased, and all that then transpired. We do not think it was incumbent on the court to do more than was done by the charge on the subject. We do not understand it to be the rule that outside of the statutory causes it is incumbent on the court to embrace or recount the facts which may suggest adequate cause, but under the general charge, these matters which may constitute adequate cause are left to be determined by the jury."

In Carpenter v. State, 62 Ark. 286, 36 S. W. 900, the court says:

"The right to defend property against one who manifestly intends or endeavors, by violence or surprise, to commit a known felony, to the extent of slaying the aggressor, does not include the right to defend it, to the same extent, where there is no intention to commit a felony. A man may use force to defend his real or personal property in his actual possession against one who endeavors to dispossess him without right, taking care that the force used does not exceed what reasonably appears to be necessary for the purpose of defense and prevention. But, in the absence of an attempt to commit a felony, he cannot defend his property, except his habitation, to the extent of killing the aggressor, for the purpose of preventing a trespass, and if he should do so, he would be guilty of a felonious homicide. Life is too valuable to be sacrificed solely for the protection of property. Rather than slay the aggressor to prevent a mere trespass, when no felony is attempted, he should yield, and appeal to the courts for redress. Ordinarily the kill-

ing allowed in the defense of property is solely for the prevention of a felony."

"The law affords ample redress for trespass committed on a man's land, but does not sanction the taking of life to prevent it. The owner may, no doubt, oppose force with force to protect his property from injury or destruction, but not to the extent of taking life, or in excess of the necessity of the case. When he carries resistance to excess and uses more force than is reasonably necessary, he becomes a wrongdoer." Davison v. People, 90 Ill. 221.

In a note 25 A. L. R. 534 it is stated:

"To justify homicide in defense of property the possession must be actual, and not merely constructive, and every effort must be made by the possessor to repel the aggression before he is justified in the killing. Richardson v. State (1922) 91 Tex. Cr. R. 318, 239 S. W. 218, 20 A. L. R. 1249."

Wharton on Homicide, p. 786, § 528, says:

"A bare trespass against or upon the real property of another, not his dwelling, does not warrant the owner in using a deadly weapon in its defense, and if he does, and kills the trespasser, it is murder, though the killing is actually necessary to prevent the trespass. Thus a homicide committed with a deadly weapon in order to prevent the removal of a line fence in dispute is murder in the absence of proof that would tend to rebut the presumption of malice arising from the use of such weapon. And the guilt or innocence of the accused in such case is in no degree dependent upon the title to the land or fence in dispute, and the courts will not inquire into the title in such case. Nor can a killing with a deadly weapon be deemed manslaughter, consisting of the unnecessary killing of another in resisting an attempt by such other to commit an unlawful act, merely because it was done in resistance of a civil trespass upon land. And where two persons are entitled to the joint use and occupation

of realty, and one of them kills the other in a dispute over such use, the question at issue with reference to the justification of the act is whether it was necessary to save his own life from such a serious assault as would create a reasonable apprehension that his life was in imminent peril, and whether the slayer did the killing to avert the threatened danger, and not whether it was done to protect his property. So, a person occupying land as a lessee, over which another has no right, is not justified in killing him to prevent him from traveling over it. * * *

"Nor does the mere act of the person killed of driving the slayer's stock off the land in controversy between them involve the protection of the slayer's property, or require an instruction to the jury in a prosecution for the killing in regard to the slayer's right to defend his property, in connection with a charge on manslaughter."

In the instant case the killing occurred over a little strip of land remote from the dwelling house of either of the parties, as in the Utterback Case, supra. The laws of this state gave to the defendant and his father ample protection by the securing of an injunction against the deceased from interfering with them in the possession of the property if they had a valid lease for 1935. On the other hand, the law gave to deceased the right to file a forceable entry and detainer suit to dispossess defendant and his father, and a speedy remedy could have been had in the court of some justice of the peace of Seminole county to determine the rights of possession; but these parties did not desire to follow the law; they took the law in their own hands. The results are that one of the parties was killed; another is to be deprived of his liberty. It was not a question of protecting one's "habitation" or "dwelling" from an intruder, or "to keep the aggressor out even to the taking of life." It was just hard-headed individuals who were willing to do or die. It is unfortunate under these circumstances that the son should be

the one to suffer, but the issues were properly presented to the jury in the county which was the home of the defendant and his father. They passed upon this issue, finding against the defendant, and this court, seeing no error therein, should not set the verdict aside.

The judgment of the district court of Seminole county is therefore affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.