2007 OK CR 9

**Phillip Dean HANCOCK, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2004–1097.**

Court of Criminal Appeals of Oklahoma.

March 9, 2007.

J.W. Coyle, III, James Hankins, Billy Coyle, Merle Gile, Oklahoma City, OK, attorneys for defendant at trial.

Cassandra Williams, James Siderias, Asst. District Attorneys, Oklahoma City, OK, attorneys for the State at trial.

Jamie D. Pybas, Division Chief, Michael D. Morehead, Appellate Defense Counsel, Okla. Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

LEWIS, Judge.

¶1 Phillip Dean Hancock, Appellant, was tried by jury and found guilty of murder in the first degree, in violation of 21 O.S.2001, § 701.7(A) (Counts 1 and 2); and possession of a firearm after former conviction of a felony, in violation of 21 O.S.2001, § 1283 (Count 4), in Oklahoma County District Court, Case No. CF–2002–3562. The jury acquitted Appellant of feloniously pointing a firearm (Count 3). Retained defense counsel represented Appellant in the District Court.

¶2 The State of Oklahoma alleged that both murders involved four statutory aggravating circumstances: Appellant was previously convicted of a felony involving the use or threat of violence to the person; Appellant knowingly created a great risk of death to more than one person; the murders were especially heinous, atrocious, or cruel; and the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.2001, § 701.12(1), (2), (4), and (7). The jury found the existence of all four aggravating circumstances in both murders and sentenced Appellant to death in Counts 1 and 2 and ten (10) years imprisonment in Count 4. The Honorable Susan P. Caswell, District Judge, presided over the trial and pronounced the judgment and sentence of the District Court on October 25, 2004. This Court stayed execution of the judgment and sentence on October 28, 2004. Mr. Hancock appeals.

## I. FACTS OF THE OFFENSES.

### A. Background.

¶3 Robert Lee Jett, Jr., died in his own back yard around midnight on the morning of April 27, 2001. He was 37 years old. Police responded to the scene on a neighbor's 911 report of shots fired. Officers found Jett lying on the ground moaning loudly, unable to tell them what had happened. Inside Jett's home, police found James Vincent "J.V." Lynch, 57, shot dead on the floor. The residence was cluttered with boxes and debris, a Harley Davidson motorcycle in a partial state of repair, methamphetamine and drug paraphernalia, and a large metal cage. Police found no one else inside the home.

¶4 A few hours later, Sandra Jett, Robert Jett's ex-wife, and her father, Homer Ferrell, told police a woman named "Smokey" might have seen the shootings. Several hours after this tip, police met with the only eyewitness, Shawn "Smokey" Tarp. She described the shooter and his vehicle, but did not know him and could not give police his name. The crime scene failed to reveal the shooter's identity. Police fielded calls and investigated leads, but almost thirteen months passed with no one charged in the killings.

¶5 A private attorney eventually told police that Phillip Hancock, Appellant, might be involved in an unsolved double homicide. Appellant had since been convicted in Logan County of drug and firearm offenses, and was serving prison time in Hinton, Oklahoma. Logan County officers had confiscated a Jennings .380 cal. pistol when they arrested Appellant. The pistol eventually proved to be Robert Jett's. In a prison interview with Oklahoma City investigators, Appellant waived his *Miranda* rights and admitted shooting Jett and Lynch with Jett's pistol. An extended statement of the trial evidence is necessary.

### B. Trial Testimony.

#### 1. Shawn "Smokey" Tarp.

¶6 Shawn "Smokey" Tarp testified that Robert Jett invited her to come down from Guthrie the evening of the shootings to show her his motorcycle and pay back a loan on some coins. She arrived around 9:45 p.m. and entered the home to see James Lynch sitting in a chair in the living room, while Jett worked on a motorcycle in "what we call the Harley Room." Tarp believed Jett was

trying to rebuild a starter on the Harley, and was becoming frustrated with it. A third man, whom she did not know, sat on a motorcycle seat near Jett in the Harley Room. At trial, Tarp identified Phillip Dean Hancock as that man.

¶ 7 Jett, Lynch, and Tarp all talked. Tarp sensed that a separate conversation and underlying tension had been going on between Jett and Appellant. Appellant would at times interject in the conversation that he "should just shut the fuck up, I'm here to be friends." The nature of the conversation between Appellant and Jett made Tarp "think that there was a falling out they were trying to put past them."

¶ 8 Tarp never heard Lynch or Jett say anything in response to Appellant's comments. Jett's cell phone rang. Tarp answered it at Jett's request, took it to Jett in the Harley Room, then returned to the couch in the living room. Jett spoke briefly on his phone and hung up. He worked another five minutes on the motorcycle before throwing up his hands in frustration. Jett went to the bedroom and changed clothes. Tarp helped Jett look for his moccasins, and saw Jett load or check a pistol while standing next to her in the living room. He placed the pistol in his waistband.

¶ 9 As Jett readied to leave, James Lynch lay on his stomach on the living room floor, sorting motorcycle parts. Appellant had moved from the Harley Room to the living room, sitting close to where Lynch was sorting parts. Tarp recalled tension between Appellant and Robert Jett as they discussed a pair of glasses on the coffee table. Appellant said the glasses belonged to his estranged girlfriend, Katherine Quick, who had spent the night before last on Jett's sofa after moving out of Appellant's house. Jett said the glasses were his. Tarp felt that

Appellant cared in some way that his girlfriend had been at the house.

¶ 10 Tarp asked if she could go with Jett on his errand. He said no and kissed her goodbye on the cheek. She asked Jett if he had both of his cell phones. Jett had both phones, but needed cigarettes. Tarp saw a pack of Camels on the coffee table and handed it to Jett. Jett grew angry when he saw the pack was open. He screamed at Appellant, "Did you open these cigarettes? I told you not to open these. There must be four or five packs open in this house." Appellant said he opened the pack. "And Bob got really mad about it . . . He told the guy to get in the cage."[1]

¶ 11 At some point, Jett grabbed a metal break-over ratchet tool and walked toward Appellant swinging it. Tarp was unsure if he hit Appellant or just threatened him with the wrench.[2] Jett said to Appellant, "I told you to get in the fucking cage." Tarp testified Jett's anger was real, and, though she was in disbelief at his behavior, he was not joking.[3] When Jett made this second command, he and Appellant were "[r]ight next to each other." Jett's voice was louder than before. Sensing trouble, Tarp stood up at the end of the coffee table. Jett walked backed toward her, and was standing right next to Tarp when Appellant jumped up and came at him. Tarp saw them fight only for a few seconds before going through another bedroom door that opened into the hallway. Tarp then heard a sound. ". . . I wasn't sure, but after the second one I knew it was bullets, gunshots." By the third shot, she saw Jett running away and heard him say "I took one." Tarp heard a fourth shot after seeing Jett running. Jett ran from the living room through the Harley room, through the kitchen, and out the back door into the yard.

¶ 12 Tarp took refuge from the shooting underneath boxes piled at a window in a

1. Tarp testified she thought the cage was for a dog.

2. "And he was slinging the thing as he walked over and all. I don't know that he hit him in the head though. I would think if he had been hit, I would have known that. I don't know if he hit him or not. But I imagine that would hurt like hell.. I would have either heard Phil say something or something . . . I don't believe that he

was hit because if he had, I'm sure that it would have been a reaction on Phil's side, and he was just sitting there . . . But I'm not sure if he hit him or he didn't hit him. It looked like he was—he was close enough he could have hit him."

3. "I mean, I was like—I was in disbelief, I couldn't believe that he was actually meaning that he really wanted him to."

second bedroom. Jett fled his attacker "through the Harley room, through the kitchen, through the back door, and was running around the back side of the house away from the gun." Tarp heard three more shots that sounded different. "And then J.V. fell really hard ... I heard four and then three." From her hiding place, Tarp heard the shooter follow Jett through the Harley Room and out the back door. She heard Jett fall in the back yard outside the window. Tarp heard Jett say, "I'm going to die," and the shooter reply, "Yes, you are," followed by two more shots. She could hear Jett pleading for help.

¶ 13 Tarp estimated the whole episode transpired in "maybe 45 seconds or so." As she remained hidden, Tarp heard the shooter come back in the house and walk around for "at least five minutes." When the house fell silent, Tarp left her hiding place and went to the bedroom door. She listened from there a few seconds, then walked into the living room. She saw Lynch lying on the floor, blood surging from his chest. Lynch had obviously moved from where he had been lying on the floor sorting parts.[4] Tarp's purse, containing her car keys, was trapped beneath Lynch's head. She then realized in horror that Appellant stood watching her at the front door.[5] She saw the gun in his hand and closed her eyes, thinking she would be shot.

¶ 14 "I'm sorry you had to see that," Appellant said. "You're not like the other girls." He asked her sternly, "What do you want to do now?" Tarp replied, "I just want to go home." He said "And I'm going to let you ... I want you to give me two minutes and don't look at the tag on the truck." Appellant got in his truck and backed away. He did not limp or appear to be injured. "He was very calm." Tarp removed her purse from under Lynch's head and ran out

the front door. As she fumbled to start her car, Tarp saw the shooter's red pickup truck stopped in the road four houses down the street. Appellant was checking something underneath the truck.[6]

¶ 15 Tarp left the scene going the opposite direction. She phoned Sandy Jett from a grocery store, telling her James Lynch was dead and Robert Jett needed help. Sandy Jett told Tarp she would call 911. Tarp then went to her employer's home, let herself in, and sat alone at the table writing down what had happened. Finding Tarp sitting at her table exhausted around 6 a.m., Tarp's employer helped her clean up. They called police.

¶ 16 Tarp admitted she smoked marijuana at Jett's home that evening, and that the three men used methamphetamine. She believed she left the scene at "just before midnight." Tarp identified photographs of items at the crime scene, including papers she left on the sofa, a flashlight, a basket, and Jett's wallet. She agreed the photos depicted the sofa as it looked that night. Tarp stated finally that she never saw anyone grab the shooter by the throat or choke him on the living room sofa.

### 2. Post–Mortem Findings.

¶ 17 Robert Jett suffered four gunshot wounds. The fatal bullet entered the top of Jett's right shoulder traveling downward, damaging Jett's lung, heart, liver, and abdominal aorta. Another bullet struck Jett's right arm and went through, re-entered his right flank, and traveled left and slightly downward through his body without striking the vital organs. A third bullet hit Jett's right kneecap traveling left and downwards, exiting behind the knee. The absence of powder burns and stippling (abrasions

---

**4.** "I hear the fighting and then the bullets, then Bob running through the Harley room ... Running away from the shots ... My feelings were when I was standing in the hallway that J.V. stood up to intervene and that's when he was shot."

**5.** Tarp initially testified the shooter had the gun pointed at her head. On cross-examination, counsel confronted her with prior testimony that he was standing at the door and still had the gun.

On re-direct, the State introduced her prior testimony that she "figured" all he would have to do is pull the trigger to shoot her.

**6.** Police recovered an exhaust pipe from the street which toolmark examiner Ronald Jones later compared to the exhaust pipe under Appellant's red Chevrolet pickup truck. Jones testified the severed exhaust pipe was once connected to the muffler pipe on Appellant's truck.

caused by powder particles) suggested these were not contact or close-range wounds.

¶ 18 Jett's blood tested positive for methamphetamine in a concentration of 1.4 micrograms/ml. A forensic toxicologist testified this was a "fairly high level of methamphetamine likely produce irritability, slurring of speech, quick reactions … increased blood pressure, increased heart rate, increased temperature, those types of things … it speeds things up." Jett's methamphetamine level could be tolerable for an abuser. Both the Medical Examiner and toxicologist testified that methamphetamine did not cause the deaths of Jett or Lynch.

¶ 19 James Lynch suffered a non-fatal gunshot wound to the left cheek with injury to his upper jaw and tongue. The bullet stopped in the soft tissue near the cervical spine. The stellate pattern of this wound usually appears in contact gunshot wounds, but the Medical Examiner observed no gunshot residue or stippling. Lynch also had a gunshot wound to the fingers of his left hand, possibly where the first bullet struck before entering his cheek. The fatal bullet entered Lynch's right lower chest and passed through the body, upwards and to the left, coming to rest in the soft tissue of Lynch's back. In all three wounds, the absence of gunshot residue and typical signs of close-range or contact fire indicated the bullets came from a "distant" range of fire.[7] James Lynch's post-mortem blood level of methamphetamine was .23 micrograms/ml.

### 3. Crime Scene and Firearms Investigation.

¶ 20 Police recovered six .380 caliber shell casings in the living room, a seventh in the back yard. Six were fired from Jett's .380; identification of the seventh casing was inconclusive. Four projectiles recovered from the bodies of Jett and Lynch matched positively to Jett's .380. Two cell phones on the living room couch and several packs of cigarettes were recovered, along with methamphetamine and paraphernalia.

¶ 21 Sergeant Larry Spruill gave expert opinion, from his examination of the crime scene, that the condition and placing of objects in the area of the sofa were inconsistent with the forced beating later described by the Appellant in his statements to police and subsequent trial testimony. Spruill saw papers perched precariously on the back on the sofa and a somewhat fragile wicker basket sitting on the sofa with no apparent damage. The center sofa pillow appeared to have been pulled away from its normal position when Lynch came down on top of it. Spruill testified that Lynch fell to the spot where he was found, and small box of drill bits fell off the table after that. Though small and cluttered, the house lacked what he would "expect to see if a very intense fight had taken place" in the sofa location where Appellant claimed Jett had beaten him while Lynch held him down. "The only disarray I can find in the living room, really, is the positioning of the [coffee] table." Spruill found the table's positioning consistent with Lynch falling against it as he went to the floor.

¶ 22 Spruill also testified about the unusual stellate tearing of the bullet wound to Lynch's cheek. The pattern typically appears where the pressure of escaping gas around the muzzle tears through skin during a gunshot, consistent with the weapon being in contact or near the skin surface. Gunshot residue, powder burns, and stippling are usually seen. Lynch's facial and hand wounds contained no gunshot residue, suggesting a longer muzzle-to-target distance. Spruill concluded that the stellate tearing likely oc-

---

7. In addition to the Medical Examiner's findings that no gunshot residue was present in the wounds to Lynch and Jett, firearms examiner Ronald Jones testified that he was unable to visually, microscopically, or chemically detect the presence of powder or gunshot residue or particles on Lynch's shirt. Jones specifically said: "Anytime you fire a firearm, you obviously are going to get a substantial amount of gunshot residue. In extremely close shots, you get the damage added, the added damage of muzzle blast, you get some burning and singeing oftentimes, perhaps a star-shaped pattern because of the way the gases escape. And even out to a few inches you'll get a very dense and dark pattern of gunshot residue. It may look like soot, it may look like particulate, there may be some burning with it, so—because you are that close to escaping gases, you'll get those on whatever your target is at that distance in the absence of something intervening."

curred when the bullet struck Lynch's hand—destabilizing its flight—while the hand was in hard contact with Lynch's face.

¶ 23 Muzzle-to-target tests of Robert Jett's pistol, conducted by defense expert Ed Heuske,[8] indicated to Spruill that the muzzle of the firearm was *not less than* 36 inches away when it shot the rounds that struck both men. Spruill also testified that police never saw an iguana in the house, "but we heard him." He agreed the cage in the house would hold an iguana. He also stated that police found a socket wrench or break-over bar of the type described by Ms. Tarp and Appellant. The State rested.

### 4. Witnesses for the Defense.

¶ 24 Appellant called Dr. J.D. Crooks to testify that an October, 2001 x-ray examination revealed old fractures of Appellant's left fifth and sixth ribs, sustained in the previous three to six months. Steven McCaslin verified he had seen Robert Jett fire the .380 pistol and identified it as Jett's personal weapon. McCaslin also testified that a nick on the barrel of the gun had not been there the last time he saw the pistol, but could not say how or when the nick occurred. Shelley Madden testified that in January, 2000, and April, 2001, Appellant purchased safety glasses, like the ones shown in crime scene photos, from her supply store.

¶ 25 J.D. Spaulding, a private contractor, testified that Appellant wasn't able to work much in April and May of 2001 due to leg and side injuries. Appellant initially told Spaulding "he had been beaten up." In June, 2001, Appellant told Spaulding he had killed two men who were trying to put him in a cage. Appellant told Spaulding "that he had no choice, it was him or them ..." Spaulding had also seen Appellant carrying "a cheap .380." Spaulding agreed that he did not report Appellant's confession to police at that time, but later turned Appellant in to police when Appellant sought help from him after escaping the Logan County jail.[9]

¶ 26 Paul Gould testified that Appellant came to his house after midnight in April, 2001. Appellant was bloody and his side was hurt. Gould gave him a T-shirt to wipe his hands off with some water and supplied a wrap for his ribs. Appellant had a gun with him. Defense counsel also offered to prove that Appellant told Gould "that he had beat up one of them with a break-over bar and then a man tried to put him in a cage, he got the gun away and shot him." The District Court excluded this statement from evidence as hearsay.

¶ 27 Appellant's neighbor, David Clancy, testified that he was present in late April, 2001, when Katherine Quick moved out of Appellant's residence. He denied seeing any animosity between Appellant and Robert Jett on that day or the two other times he had seen Appellant and Jett together. Around Easter, 2001, Clancy, Donnie Butler, and Appellant were tending a brushpile as it burned behind Clancy's trailer. Robert Jett was also there. Clancy recounted how Jett had startled the three men at some point when he "squeezed off a couple rounds pretty quick" from a rifle while standing behind them. Clancy told Jett to put up the rifle, and he did.

¶ 28 Clancy testified that when he saw Appellant a few days after the shootings, Appellant was "limping on one leg and complaining about his chest, he couldn't hardly breathe, like a cracked rib ..." Appellant had "big old bruises" on his shins. Two or three months later, Appellant told Clancy that "Bob Jett tried to put him in a cage and he fought his way out." Appellant explained that he killed Lynch "because he was there helping Bob."

¶ 29 On cross-examination, Clancy testified that Katherine Quick was upset and arguing with Appellant the night she moved out, because Appellant had disabled her vehicle. Appellant and Quick were "off and on at times" as a couple, but that night, "it looked like it was over for them." Despite this, Appellant "was calm, didn't have no problem.

---

8. According Heuske's report, which Spruill read and relied on, 36 inches "would be the maximum range that firearm is capable of leaving residue on a target."

9. Appellant's escape from the Logan County Jail was excluded from evidence.

He was like, if you were going to move, move." Clancy denied he had offered an alibi for Appellant during his interview with police. Clancy recalled that within a week of the shootings, Appellant traveled alone to Missouri and stayed two or three weeks. Katherine Quick eventually moved back into the residence with Appellant after the shootings.

¶ 30 Katherine Quick testified she lived with Appellant for about a year, working for Appellant at Hancock Construction. She was addicted to methamphetamine at the time. She confirmed Robert Jett shot a rifle on Easter, 2001, behind Dave Clancy's trailer. The Easter gathering at Clancy's home, where Appellant, Jett, and others were present, involved "getting high." Her relationship with Appellant soured when he found her intravenous rig for injecting methamphetamine. She explained that "he didn't do it that way and it hurt him that I was doing it that way, that I took it to the next level."

¶ 31 Quick was using drugs heavily on April 24, 2001. Appellant was concerned about her driving, so he disabled her ignition. When Appellant found her intravenous rig for shooting methamphetamine, she decided to move out of their house. Robert Jett "just happened to show up that night and he helped me get the key out of my ignition." She denied any romantic connection to Jett or any jealousy between Appellant and Jett. She had known Jett "about a month" and only been to Jett's house two or three times, but went there to do drugs the night she left Appellant. She slept that night on Jett's sofa.

¶ 32 Appellant was sitting calmly in Jett's house when she woke the next morning. He had come to get his cell phone. She retrieved the cell phone from her truck while Appellant sat in Jett's house. Robert and Sandra Jett were asleep in the bedroom. Quick could not remember how long Appellant stayed at Jett's house that morning. Appellant did not seem mad at Robert Jett that morning. She had seen the large cage in Jett's house but not the iguana. She identified the sunglasses Appellant bought for her in a picture of Jett's living room.

¶ 33 Appellant called her after she had already heard news of the shootings. When she saw Appellant, "I seen all the marks, how he was beat up ... on his arm, on his leg, bruises on his ribs, busted lip, mark on his head ... He was hurt pretty bad. And we talked about it and I left with him ... I went home with him." Quick testified Appellant remained in Oklahoma for a month and a half after the shootings. Appellant then "left and went and stayed with his aunt for a while" in Branson, Missouri. Appellant appeared fearful of Jett's friends. On cross-examination, Quick admitted she was in the courtroom when Appellant testified. Quick said she was unaware the Appellant had told others she was untrustworthy, or that he believed she had "set him up" to be hurt by Jett. She persisted that she had left Appellant when he became upset about her intravenous drug use. She did not know how long Appellant stayed in Missouri.

¶ 34 The defense presented expert testimony that the bullet hole in Lynch's shirt bore no indicia of a close-contact gunshot wound either by gunshot residue or typical damage to the shirt fabric. The expert, Ed Heuske, found only a few gunpowder particles near the hole, but attributed their presence to contamination rather than gunfire. A "modified Greiss" test chemically identified the presence a "couple of gunpowder particles" near the bullet hole. Heuske felt the fact that police did not attempt to recover bullets for three of the fired shots left "a lot of questions about where shots were fired from and what directions and so forth."

¶ 35 Heuske agreed with Larry Spruill that a destabilized bullet in flight might have caused Lynch's stellate cheek wound. However, he told the jury that research literature suggested some gunshot wounds to the cheek display the stellate pattern without close-range or contact muzzle-to-target distance. Heuske could not conclusively establish the sequence of shots fired in the case relative to wounds inflicted on Jett and Lynch. He could find no evidence to support Appellant's claim of close-range or contact firing at Jett and Lynch. He offered the possibility that, in Lynch's case, intermediate targets, such as cushions or the couch, might have intercept-

ed the flight of the bullet and absorbed the gunshot residue before striking Lynch. Heuske also explained Appellant's claim of close-range fire might be a false recollection from a stressful event.

### 5. Appellant's Testimony.

¶ 36 Appellant testified that in 1982, at age eighteen, he was convicted of manslaughter and served two and one-half years in prison. He claimed self-defense at his 1982 trial.[10] He admitted several other felony convictions including his recent Logan County felonies for possessing drugs, precursor chemicals, and the pistol used in the shootings.

¶ 37 Appellant described Katherine Quick as a "bipolar, manic-depressive, paranoid schizophrenic" who, like Appellant, abused methamphetamine. He first met Robert Jett sometime in 2000 at Dave Clancy's home. They subsequently used methamphetamine several times, at Appellant's house in Guthrie and Jett's in Oklahoma City. Appellant related how, on Easter, 2001, Jett walked up behind Donnie Butler and fired an AR–15 rifle several times near Butler's head "to intimidate him."

¶ 38 When Appellant and Katherine Quick fell out over her IV drug use, on April 24, 2001, Robert and Sandy Jett, Dave and Temple Clancy, Debbie Hodges, and a woman named Holly helped Quick relocate. Appellant denied arguing with Robert Jett (or James Lynch) about anything. Quick spent the night of her departure from Appellant's house on Robert Jett's sofa. The following morning around 8 a.m., Appellant went to Jett's residence to retrieve a cell phone taken by Quick during the move. Appellant thought he heard someone say "come in" and opened the door. Quick was asleep on the couch. Robert and Sandy Jett were asleep in the bedroom. Appellant got the cell phone and left.

¶ 39 Donnie Butler called the following day, April 26, 2001, and told Appellant to call Robert Jett. Jett allegedly told Appellant in this phone call that "Kathy was acting weird and wanted to come home and I needed to

come get her." Appellant testified he arrived at Jett's house about 10:45 p.m. Quick wasn't there. Jett invited him in. Appellant asked for a cigarette from a pack laying on the table. Jett said "yeah." Appellant went into the room where Jett was working on the motorcycle. Lynch was sitting on the arm of the rocking chair in the living room.

¶ 40 Before Shawn Tarp arrived, Jett asked him, "Did you just walk in my house yesterday? I ought to put you in that cage." Appellant apologized, explaining he thought someone said "come in," but opened the door to find everyone in the house asleep. Appellant held a drop light while Jett attempted to put the back tire on the motorcycle. Appellant "just wanted to get Kathy and go back home," but she never came.

¶ 41 "Smokey" Tarp arrived around 11:30 p.m. She asked Jett for a "teener" of methamphetamine. Jett chopped a quantity on a mirror, and everyone did a line. Appellant saw Quick's sunglasses lying on Jett's coffee table and stated that Kathy had left her glasses. Jett picked them up and said, "No, these are my night riding glasses." Appellant "wasn't going to argue with him."

¶ 42 When Jett's phone rang, he picked it up, gave it to Tarp, and told her to answer it. She answered the phone and handed it back to Jett. Jett hung up with the caller after a few seconds, and said he was going to run an errand. Jett went to his bedroom. Appellant looked up after Jett emerged from the bedroom and saw Jett pull the slide back on a pistol, "looking in it," and place it in his belt. Jett walked over to the front door and locked it. Tarp asked Jett if he had everything. Jett looked at the table and said something about needing cigarettes.

¶ 43 In Appellant's version, Jett picked up the cigarettes, "looked at me and said 'Did you open this pack of cigarettes?' And I said 'Yeah, You told me I could have a cigarette when I came in ... I asked you if I could get a cigarette.'" Jett then said "I must have five packs opened around here."

---

10. The District Court excluded evidence that Appellant was charged with first-degree murder in the 1982 case.

And [Jett] takes off the vest and throws it on the floor, and then the next thing I know he's standing—I'm sitting on that black vinyl rocking chair, and next thing I know he's over the top of me with a break-over bar saying 'That's it, get—mother-fucker, get in the cage.'

¶ 44 Jett swung the break-over bar and hit Appellant in the arm. He moved in front of the Appellant rather than across the room as related by Tarp. Jett moved to the threshold of the living and dining rooms, switched the break-over bar from his right hand to his left, and reached for his gun.

I didn't think I could make it out the front door before Bob would be on me, and the voice in my head said, if I go in the cage, my brother's not going to have a big brother anymore. And as Bob started pulling the gun out, I jumped up off the seat ...

¶ 45 Jett punched Appellant "right in my chest" with the bar. Appellant got the barrel of the gun and tried to twist it back into Jett's leg. Jett struck his wrist with the break-over bar. Lynch "instantly got up—I didn't know he was getting up," grabbed Appellant from behind "like you'd sack a quarter back," and "tried to take my head off." Lynch dropped Appellant to the couch "in a choke hold," his lower legs extended over the arm of the couch, "just past the point where I couldn't get my leg down."

¶ 46 Jett, now at the side of the couch with the break-over bar in both hands, "started hitting me as hard as he could right in the middle of my shin, and he was deliberately breaking my leg." Pinned on the couch by Lynch, Appellant realized he was now holding Jett's pistol by the barrel.

I was more than happy to offer up my leg to him. I had the gun in my possession. I flipped the gun around and I pulled the trigger and it went click (indicating). And when I clicked the gun, Bob took his attention off of my leg and started leaning in and hit me in the hands and the gun, and I managed to rack it back and get a bullet chambered.

¶ 47 Appellant pulled the gun up to where Jett could not knock it away, but Jett "was able to hit me in the chest." Appellant fired twice at Jett "and he didn't even flinch."

He came between my legs and ... had the break-over bar over his head like this (indicating), so he could get in close to my head to hit me. And with J.V. choking me—I could choke myself so you know what I sound like—but I was fighting to get air across my vocal cords and said 'I just killed you, bitch.' And I had the gun pointed right at him, I could have shot him, again. And he was standing in my crouch (sic) with the break-over bar over his head (indicating) to hit me, and he looked down at his chest and he looked back at me and said, 'Yeah, you did.' And he dropped the break over bar over his head and he took off.

¶ 48 This left the matter of breaking free from James Lynch. Appellant switched the gun to his left hand and "put it directly into what I thought was his chest. I pushed it. I pushed it hard. It felt like I pushed it into three or four inches of fat. I pulled the trigger." Wounded, Lynch pulled Appellant off the couch with him, and Appellant "fired as I was coming up—as I broke his grip off of my neck, I—I fired again. I guess I fired more than I even thought I did ... Smokey stood up behind me on the couch. She was sitting on the couch the whole time."

¶ 49 Appellant motioned to Tarp to keep still, because he "thought Bob was going to come back in the room, because he didn't flinch when I shot him." Appellant testified he then told Tarp to get out of the house. "I meant for her to run out the front door. I didn't realize she was going to run into the bedroom." Appellant then went into the Harley Room looking for Jett. He heard "a noise in the back room and I thought it was Bob in there getting his AR–15 that he's got, and all I could think of is I had to get out of that house, I had to get some distance away from Bob because he was getting so close to getting the gun." Appellant saw the back door was open and headed into the darkened back yard. "Three strides off the back porch," Appellant encountered Jett again.

And he was kicking at me. His feet were in my face. And the gun was still in this hand, because this hand was swollen up

(indicating). And it was—it was a knee-jerk reflex from the hip and I just—I fired and I tried to fire again, but it was empty ... I could see Bob laying on the ground. And he was nowhere near where they've got him in the pictures. There's no way I could have run through that backyard. It was an obstacle course.

¶ 50 Appellant denied pointing the gun at Tarp. Meeting her again in the house, he said, "Don't be afraid, ma'am, I'm not going to hurt you."

I didn't call her sweetie ... I put my hand on her shoulder and I said, 'I'm sorry you had to see that.' And I wasn't referring to me shooting them, I was referring to them attacking me. I was apologizing for their actions.

¶ 51 Appellant told Tarp he would leave first and then she could go. He denied stopping the truck down the street, as Tarp described. "Nothing fell off my truck." Appellant went to Paul Gould's residence and stayed until 4:30 a.m. Appellant testified that he believed Jett's order to get in the cage "equaled death."

There was no way he could put me in a cage and let me out. I'm not going in a cage. There's no way he can put a person in a cage and then let them out ... Instant—instantly I knew he couldn't let me out of the cage. That's a felony, to kidnap somebody and assault them with the break-over bar ... I didn't think he could let me out of the cage without risking prosecution.

¶ 52 Appellant left the house because "I was in pain, I was hurt, and I was scared." He explained that he didn't turn himself in later because of fear of "the other bikers," one of whom, Lynch's brother, he had seen "on the news the next day saying how they were going to get me." Appellant's direct testimony ended with his statement, "I'm sorry they had to die, but I had to fight."

¶ 53 Cross-examination established Appellant never claimed in prior statements that Jett locked the front door. He also admitted that he never told police Jett had taken his jacket off and thrown it to the floor; or that Jett had struck his arm with the break-over bar; or that Jett was pulling the gun from his pants when Appellant engaged him.

¶ 54 Appellant testified that when Quick moved out of their house, she had told him she would be staying in her car at her Oklahoma City rental property on 41st Street. Because Jett's house was on the route he took to Quick's rental property the next morning, he saw Quick's vehicle parked in Jett's driveway. He went in to get his phone, and stayed "30 minutes to an hour." Appellant disowned a previous statement claiming Donnie Butler had told him "Kathy called and wanted me to meet her at Robert's," saying at trial that Butler only told him to call over to Robert Jett's. "And when I called over to Bob's, Bob said 'You need to get Kathy, she wants to come home.'" While admitting that James Lynch was obese, Appellant denied seeing him walk with a limp or have mobility problems.

¶ 55 Appellant's allegation that the investigating officers manufactured evidence that the broken tailpipe recovered at the scene was consistent with the exhaust system on his pickup truck, and his conspiracy theory that Jett and/or Quick had actually "lured" him from Guthrie for the express purpose of putting him in the cage and killing him, may have done additional damage to his credibility.

### 6. State's Rebuttal.

¶ 56 In the State's rebuttal, Dorothy Belknap, a Nurse Practitioner for the Veterans Administration who was James Lynch's primary health care provider, testified that James Lynch was morbidly obese and suffered diabetes. Lynch "always walked slowly and always with a limp" because of a hip replacement. Additional facts are related in connection with Appellant's individual claims of error.

## II. CHALLENGES TO THE CAPITAL CONVICTIONS.

### A. Sufficiency of the Evidence.

¶ 57 Appellant's Proposition I divides his challenge to the sufficiency of the evidence into three related arguments. In sum, he argues that the proof fails to show intent

to kill by legally sufficient evidence; that his claim of self-defense, properly raised, was never disproved beyond a reasonable doubt; and that, at most, he could be guilty of manslaughter by killing in a heat of passion or resisting a criminal attempt. 21 O.S.2001, § 711. Appellant demurred to the evidence at the close of the State's case-in-chief, but waived his right to appeal the trial court's ruling on his demurrer by offering evidence that he killed both men in self-defense. *Young v. State,* 2000 OK CR 17, ¶ 34, 12 P.3d 20, 35. This Court therefore looks to the entire trial record to determine "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Young,* at ¶ 35, 12 P.3d at 35, *citing Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203.

¶ 58 The parties marshaled evidence and arguments supporting their respective theories of malice aforethought murder and justifiable homicide in self-defense. Many of the facts are in conflict. Prosecution and defense testimony agree that Jett became overtly hostile over Appellant's opening of the pack of cigarettes and, having swung a break-over bar in Appellant's direction or hit him with it, ordered Appellant into the metal cage. The State's proof has Jett returning to the other side of the room, while Appellant says Jett rapidly escalated the situation by reaching for his pistol from a few feet away. Tarp tells how she was pushed from the room in the physical attack, again in conflict with Appellant's account of being tackled and pinned by Lynch and then savagely beaten by Jett, all while Tarp was still in the room.

¶ 59 Tarp testified Appellant left the property calmly and without significant injuries. Appellant and his witnesses testified to his injuries. Most of the evidence about the gunshot wounds indicates a muzzle-to-target range of thirty six inches or more. Appellant insisted at trial that he fired at least twice at Jett from close range; at least once while he thought Lynch's body was in contact with the pistol barrel; and twice more at Lynch from close range as he broke free.

¶ 60 The State theorized the trouble between Appellant and Jett was Appellant's anger and frustration over the breakup with Katherine Quick. Appellant did not want Quick to leave their home two days before; he disabled her car ignition. Against his wishes, she had moved out and ended up at Robert Jett's house. The State inferred that Quick had not invited Appellant to come to Jett's that next morning, and was disturbed to see him sitting in Jett's house when she awoke.

¶ 61 The State inferred that in the thirty minutes to an hour he spent at Jett's that morning, Appellant tried unsuccessfully to win Quick's return. Neither Appellant nor Quick knew Jett all that well; his basic relationship to them being methamphetamine supplier and fellow drug abuser. But when Appellant left Jett's house the morning before the shootings, Katherine Quick was choosing her IV drug habit—and associates who were more or less indifferent to it—over life with him.

¶ 62 Appellant knew that Quick went to Robert Jett's when she wanted drugs. When Appellant showed up at Jett's house the night of the shootings, Quick wasn't even there. Jett was working on his motorcycle. He had called in his debt from Shawn Tarp and she was coming to pay. Tarp's testimony about the tensions she sensed when she arrived supports the inference that Appellant and Jett had been discussing the difficulties of the last few days, involving events and people to which they were privy, but Tarp was not.

¶ 63 Prosecution and defense testimony also agrees that Jett was irritated when he learned Appellant had come in the house the previous morning. Appellant was probably no more welcome when he returned the following evening, perhaps hoping to plead for Katherine Quick's return or smooth things over with Jett.

¶ 64 Both men were taking methamphetamine. Jett abused Appellant over the borrowed cigarette, swung the break-over bar at him, and ordered him into a cage. Appellant, already smoldering, accosted Jett with the element of surprise, seized the pistol from his belt, and proceeded to shoot Jett

and Lynch, when neither man confronted him with an imminent threat of death or great bodily harm. From the evidence, these inferences support the State's theory of a double murder.

¶ 65 The Oklahoma Statutes define first-degree murder as the unlawful killing of a human being with malice aforethought. 21 O.S.2001 § 701.7(A). Premeditated design sufficient to establish malice aforethought may be inferred from the fact of killing alone, unless the facts and circumstances raise a reasonable doubt as to whether such design existed. 21 O.S.2001 § 702; *Freeman v. State*, 1994 OK CR 37, 876 P.2d 283, 287. The unlawful design to effect death, by which a homicide constitutes murder, may be formed instantly before committing the act by which it is carried into execution. *Williams v. State*, 1991 OK CR 28, ¶ 11, 807 P.2d 271, 274. Because the State must also prove that the deaths were "unlawful" as an element of first-degree murder, we agree with Appellant that "the State was obligated to prove, beyond a reasonable doubt, that Appellant did not act in self-defense." *McHam v. State*, 2005 OK CR 28, ¶ 10, 126 P.3d 662, 667, *citing Perez v. State*, 1990 OK CR 67, ¶¶ 5–8, 798 P.2d 639, 640–41. The District Court here instructed the jury on the elements of first-degree murder, the law of justifiable homicide in self-defense, and the lesser-included offense of first-degree "heat of passion" manslaughter.

¶ 66 A jury's resolution of the element of intent withstands appellate scrutiny "if a rational trier of fact could have found beyond a reasonable doubt the presence of intent when viewing the evidence in the light most favorable to the State." *Williams*, at ¶ 11, 807 P.2d at 274, *citing Treece v. State*, 1988 OK CR 67, ¶ 4, 753 P.2d 377, 378. This Court has held "it is the exclusive province of the jury to weigh the testimony and circumstances to determine malice aforethought." *Hiler v. State*, 1990 OK CR 54, ¶ 11, 796 P.2d 346, 349. Whether the actions of Jett and Lynch justified the killings in self-defense, or provoked Appellant's passions enough to reduce one or both of the crimes from murder to manslaughter, was also a question submit-

ted for the jury's resolution under the instructions and evidence.

¶ 67 Traditionally, if there is evidence from which a jury could conclude that a defendant is guilty, this Court will not interfere with that verdict, even if sharp conflicts in the evidence exist. *Vick v. State*, 1988 OK CR 110, ¶ 4, 756 P.2d 1239, 1240. *Wilkie v. State*, 1926 OK CR, 33 Okl.Cr. 225, 242 P. 1057, bears a similarity to this case in that the prosecution's evidence "would indicate that the defendant killed deceased without justification, while that of the defendant tends to raise the issue of self-defense." In *Wilkie*, the court's instructions submitted the issues of murder, manslaughter in the first degree, and self-defense. 242 P. at 1058. This Court held:

> Under the contention that the evidence is insufficient, it is argued that the defendant can be guilty of no higher offense than manslaughter in the first degree. The law applicable to first degree manslaughter was fairly submitted, but the jury by its verdict found against the defendant, and the evidence fully sustains their verdict.

*Id.*

¶ 68 *Hendrick v. State*, 1937 OK CR, 63 Okl.Cr. 100, 73 P.2d 184 is another case where the evidence was "highly conflicting as to who was the aggressor at the time of the fatal difficulty." 63 Okl.Cr. at 105, 73 P.2d at 187. The defendant and his father testified that defendant fired the fatal shots as the deceased attacked him with a claw hammer. The wife of the deceased testified he was unarmed when the defendant opened fire. A fourth witness saw the hammer still in the dead man's pocket as he lay on the ground. A fifth witness saw the hammer on the ground near the deceased. There the Court said:

> The jury, after hearing this conflicting evidence, seeing and observing the witnesses on the stand, and hearing the charge of the court, which when carefully read protected the rights of the defendant, found the defendant guilty. This being true, it is not for this court to say that the verdict of the jury was contrary to the evidence ... The argument presented by the able brief filed by attorneys for the defendant, in this case

presents an argument that the jury could have well considered; but in view of the conflicting testimony it is not the province of this court to disturb the verdict when it has been adverse to the contention made by the defendant.

*Hendrick,* 63 Okl.Cr. at 105, 73 P.2d at 187–188.

■ ¶ 69 The same could be said in the present case. Counsel for Appellant endeavors in the brief to amplify consistencies between Appellant's claim of self-defense and the crime scene evidence, and to expose every perceived misstatement of law and fact in the State's testimony and arguments to the jury. However, members of the jury "are not bound to believe the testimony or any part of the testimony of any witness, when in their judgment the witness may have testified falsely, or may have been mistaken. There is no statute or principle of law which requires a jury to believe a witness simply because he may be corroborated." *Williams v. State,* 1913 OK CR 98, 9 Okl.Cr. 206, 131 P. 179, 180.

¶ 70 Our review of the sufficiency of the evidence is not an occasion for choosing from among the conflicting inferences those we find more or less plausible. It is enough that the jury might draw the permissible inference of malice aforethought from the witnesses and evidence at trial. Our cases remind us that "the jury were in a much better condition to determine their credibility than the members of this court are." *Williams,* 9 Okl.Cr. at 207, 131 P. at 180. Judge Doyle observed for this Court long ago that a "question merely of fact is presented by the evidence, dependent wholly upon the credibility of the witnesses and the weight of their evidence." *Morris v. State,* 1939 OK CR, 67 Okl.Cr. 404, 413, 94 P.2d 842, 845.

> There could be no case suggested presenting a matter more proper for the decision of a jury. The jurors are the sole judges of the credibility of the witnesses who testify before them; and they are not bound to, nor can they be compelled to, credit the testimony of any witness, whether contradicted or not.

*Id.*

■ ¶ 71 The facts and circumstances, only a summary of which could possibly be set forth in the statement of the evidence above, as well as the manifold questions of weight and credibility in the testimony, were presented to the jury and argued vigorously by counsel. The daunting task of resolving the accusations of guilt is not ours, but the jury's. "[T]he jury being the tribunal upon which by our Constitution and laws is especially imposed the duty of weighing the testimony, and having so weighed the testimony and found against the defendant, it is not the province of this court to disturb their verdict." *Grimes v. State,* 1961 OK CR 102, ¶ 36, 365 P.2d 739, 747, *quoting Morris,* 1939 OK CR, 67 Okl.Cr. 404, 413, 94 P.2d 842, 845. The evidence is sufficient to support the convictions. Proposition I is denied.

**B. Rulings on the Admissibility of Evidence.**

■ ¶ 72 In Propositions II, VI, VII, and VIII, Appellant challenges the District Court's rulings on the admission and exclusion of first-stage evidence. The District Court's admission or exclusion of evidence over a timely objection or offer of proof is ordinarily discretionary and will not be reversed on appeal unless clearly erroneous or manifestly unreasonable. *Hogan v. State,* 2006 OK CR 19, ¶¶ 29, 139 P.3d 907, 920. Where Appellant fails to object contemporaneously to evidence when admitted, or make an offer of proof concerning excluded evidence, our review is limited to plain error. 12 O.S.2001, § 2104. We review Appellant's challenges to the District Court's rulings with these principles in mind.

■ ¶ 73 Appellant challenges the admission of his 1982 manslaughter conviction and related testimony in Proposition II. Appellant initially preserved the issue by timely objection to the evidence at trial. Defense counsel then introduced the fact of the conviction on Appellant's direct examination. Counsel for Appellant acknowledges the authority of *Dodd v. State,* 2004 OK CR 31, 100 P.3d 1017, where this Court held that "defense counsel waived any error by choosing to broach the subject [of prior convictions] on direct examination, thereby avoiding the

'sting' of having them first revealed by the prosecutor on cross-examination." *Id.* at ¶ 72, 100 P.3d at 1039. Cognizant of the waiver, Appellant claims ineffective assistance of counsel. *See* Proposition XI, *infra.* The issue is waived, but we will review the admission of the prior conviction for plain error. *Simpson v. State,* 1994 OK CR 40, 876 P.2d 690.

¶ 74 The Oklahoma Evidence Code authorizes the admission of prior felony convictions "[f]or the purpose of attacking the credibility of a witness." 12 O.S.2001, § 2609(A). Section 2609(A)(1) provides that in a criminal prosecution, ". . . evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Section 2609(B) excludes a prior conviction if "a period of more than ten (10) years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction . . . unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."

¶ 75 Appellant characterizes much of the District Court's rationale for admitting the conviction in unflattering terms, indulging a lengthy discourse about how the District Court admitted the conviction under either a "hybrid" interpretation of sections 2609 and 2404(B), or a creative innovation on the "near miss" admissibility for hearsay under 12 O.S.Supp.2002, § 2804.1. The Attorney General defends the ruling below not as one grounded in the Oklahoma Evidence Code as such, but rather in the common law doctrine of impeachment for bias. The State argues the evidence showed Appellant's bias, or "inclination," to claim self-defense after committing violent attacks. We do not look to the common law for a theory of admissibility in this instance, because the Evidence Code itself sets the terms for admissibility of prior convictions in criminal cases.

¶ 76 The District Court rejected the State's request to admit the conviction and its particulars under 12 O.S.2001, § 2404(B).

The State then gave notice of its intention to offer evidence about the conviction under section 2609(B) if the Appellant testified in his defense. On direct examination, the jury learned Appellant had a prior manslaughter conviction from 1982, as well as several other felony convictions; he had claimed self-defense in the 1982 homicide case; was convicted, and served two years of the prison term.

¶ 77 On cross-examination, the District Court admitted the judgment and sentence for manslaughter. The State also obtained Appellant's admission of other felony convictions for possession of precursor chemicals and possession of contraband in a penal institution. Appellant conceded his 1982 plea of self-defense, but denied that he looked at or understood the instructions on self-defense in the 1982 trial. Appellant interrupted the prosecutor's next question with the statement that "[a]ll I knew was I was being violently attacked then, and I was being violently attacked on"—at which point the prosecutor changed questions:

Q. You were being violently attacked? A man leaned into your window and you shot him five times, that's a violent attack?

Defense Counsel: Judge, I object to this.

A. (Appellant): You'd have to know Charlie Warren. He was another mean person.

¶ 78 The District Court overruled defense counsel's request for a mistrial, but instructed the prosecutor to steer clear of the facts of the 1982 case, finding that "it is appropriate that he knows the defense, he's familiar with that defense, but I don't want to relitigate that other manslaughter." The prosecutor noted that her reference to the facts of the 1982 crime was "the response to a que—a statement that he made." The cross-examination then continued on other subjects. The District Court's subsequent instructions informed the jury Appellant's prior convictions were offered as "impeachment evidence," to show "that the defendant's testimony is not believable or truthful," and that jury might consider it "only to the extent that you determine it affects the believability of the defendant, if at all." *See* OUJI–CR 2nd 9–23.

¶ 79 Standing alone, the 1982 manslaughter conviction had no legal relevance to whether Appellant acted in self-defense in 2001. 12 O.S.2001, § 2401 ("Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence). The conviction became relevant when Appellant placed his credibility in issue by testifying he acted in self-defense. The Evidence Code conditioned the admissibility of this "stale" felony conviction on proper notice to the defense and a legal determination of whether "the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." 12 O.S.2001, § 2609(B).

¶ 80 "Plain errors" are violations of legal rules clear from the appellate record that go to the foundation of the case or take from the defendant a right essential to his defense. *Simpson v. State*, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698; *Valdez v. State*, 1995 OK CR 18, fn. 6, 900 P.2d 363, 369, fn. 6. Despite the creative exchange of theories for and against the District Court's ruling, the State's manifest purpose in offering evidence of the prior conviction and Appellant's prior plea of self-defense was to attack the credibility of Appellant's current plea of self-defense. The record as a whole shows the District Court weighed both the probative value of the evidence for this purpose and its prejudicial effect. Appellant's prior conviction and his plea of self-defense were "directly relevant to his credibility as a witness," as they tended to show that Appellant had minimized his responsibility when prosecuted in a previous case and might do so again. *Dodd*, at ¶ 72, 100 P.3d at 1039. We reject Appellant's arguments that by admitting the evidence under the particular facts and circumstances here the District Court committed plain error going to the foundation of the case or taking from Appellant a right essential to his defense. *Simpson, supra.*

¶ 81 The prosecutor's reference to the underlying facts of the case was prompted by and in response to Appellant's statement. While a witness' passing comment "does not give the District Attorney an unrestricted license to say anything at all" in response, *Starr v. State*, 1979 OK CR 126, ¶ 13, 602 P.2d 1046, 1049, a witness "who offers one-sided versions of his own past conduct subjects himself to cross-examination aimed at showing the jury that he is not telling the whole truth about that conduct, and therefore cannot be trusted to tell the truth about other matters either." *Dodd*, at ¶ 73, 100 P.3d at 1039–1040. Appellant's volunteered statement opened the door to a further examination of the underlying facts in the 1982 case to impeach his self-serving characterization. The prosecutor possessed the ammunition to walk right through that door, but the District Court closed it in an abundance of caution. No relief is warranted. Proposition II is denied.

¶ 82 In Proposition VI, Appellant argues reversible error in the District Court's exclusion of hearsay statements by Appellant to defense witness Paul Gould. Defense counsel offered Appellant's statements to Gould as "part of the *res gestae*, happened immediately after"—and alleged that Gould would testify Appellant said "that guy beat him up and tried to put him in a cage." Defense counsel later modified this offer of proof, telling the Court that Gould would testify Appellant "told [Gould] *he had beat up one of them* with a break-over bar and then a man tried to put him in a cage, he got the gun away from him and shot him." (emphasis added). The District Court excluded these statements as "self-serving" hearsay. Appellant now argues alternatively that defense counsel's "res gestae" reference inartfully advanced a valid ground of admissibility, and Appellant's statements to Gould should have been admitted as "present sense impressions" or "excited utterances" under 12 O.S.2001, § 2803(2), or under the pre-Code exception for hearsay statements that are part of the "res gestae" of the offense. He also alleges trial counsel's failure to offer the correct exception to the hearsay rule was ineffective assistance of counsel.

¶ 83 For a hearsay statement to be admitted as an excited utterance, three foundational requirements must be met: A

startling event or condition; a statement relating to that startling event or condition; made while the declarant is under the stress of excitement by the startling event or condition. *Mitchell v. State*, 2005 OK CR 15, ¶ 27, 120 P.3d 1196, 1205. The Evidence Code excepts the excited utterance from the prohibition against hearsay because "its nearness to the stimulating event excludes the possibility of premeditation and fabrication." *Bishop v. State*, 1978 OK CR 69, ¶ 19, 581 P.2d 45, 48. In determining the admissibility of an out-of-court statement as an excited utterance, "[t]he critical question ... is whether the statements by the declarant were spoken under the extreme stress of a startling event so that there was no time to fabricate." *Johnson v. State*, 1982 OK CR 37, ¶ 19, 665 P.2d 815, 820.

¶ 84 The present sense impression is a hearsay statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." 12 O.S. 2001, § 2803(1). The theory supporting the admissibility of a present sense impression is similar to that of excited utterances, i.e., "that substantial contemporaneity of the event and the statement negate the likelihood of deliberate and conscious misrepresentation." Whinery, *Courtroom Guide to the Oklahoma Evidence Code*, 618 (West, 2005). The foundational requirements for a present sense impression include: a startling event; a statement explaining the event or condition; made while the declarant is perceiving the event or immediately after the event. *Welch v. State*, 1998 OK CR 54, ¶ 8, 968 P.2d 1231, 1240. Appellant concedes that the Evidence Code has largely subsumed the pre-Code "res gestae" exception in the hearsay exceptions allowed in section 2803(1–4).

¶ 85 From the record before us, the District Court did not abuse its discretion in excluding Gould's testimony. Gould testified that Appellant came to his house "real late one night or real early in the morning around midnight." Appellant's "side was hurt ... his ribs were hurting, so I had given him a wrap to put around his waist." Appellant was carrying a gun and had blood on his hands. Gould gave him a t-shirt to wipe his hands. Appellant sat down. When defense counsel sought to elicit Appellant's statements about what happened, the District Court sustained the hearsay objections. Gould was allowed, however, to testify that Appellant told him "what happened." Gould said Appellant stayed there approximately twenty minutes, during which they "were just sitting there talking." Gould agreed with defense counsel's leading questions that Appellant was "upset and nervous" and seemed "scared."

¶ 86 While the Evidence Code does not bar otherwise admissible statements merely because they are "self-serving," section 2803(2)'s requirement that the hearsay statement be made while under the stress of the startling event is "particularly important; there must be no time for reflection or fabrication." *Williams v. State*, 1996 OK CR 16, ¶ 17, 915 P.2d 371, 378. In *Williams*, we recognized that "shooting and killing two men certainly qualifies as a startling event," and held that defendant's exculpatory statement, made within seconds of the shots, should have been admitted as an excited utterance. *Id.*, at ¶ 17, 915 P.2d at 379. We emphasized there that the "words should be one continuing transaction with the event." *Id.* The Court in *Williams* also found the statement in question was sufficiently spontaneous and contemporaneous with the shooting to be admissible as a present sense impression. *Id.*, at ¶ 18, 915 P.2d at 379.

¶ 87 We may infer that Gould's testimony about Appellant's appearance at his house relates to the night of the shootings or sometime the following morning. The record does not support a conclusion that Appellant's statements to Gould were "one continuing transaction with the event" or that Appellant uttered those statements under circumstances that "exclude the possibility of premeditation and fabrication." *Bishop, supra.* The proffered evidence also lacks the "substantial contemporaneity of the event and the statement" that negates "the likelihood of deliberate and conscious misrepresentation." Whinery, *supra.* Without these traditional assurances of the statement's reliability, which alone justify an exception to the hear-

say rule, the District Court did not abuse its discretion by excluding the statements from evidence at trial. There is no error.

■■■ ¶ 88 Further considerations support the view that Appellant suffered no prejudice. If believed, Gould's testimony established that Appellant had seen Gould at some point the morning after the shootings. Gould was permitted to testify that Appellant was bloody, had a gun, appeared hurt, and told him "what happened." Appellant subsequently testified to the shooting episode at trial. Assuming Gould's excluded testimony would have squared with defense counsel's offer of proof, it only established that Appellant suffered injuries (as he claimed at trial), and probably told Gould he killed two men while he was defending himself.

¶ 89 Based on the testimony the jury did hear, it could readily infer that Appellant made exculpatory statements to Gould after the shootings. The corroborative force of these statements appears minimal since the jury was disinclined to believe Appellant's sworn trial testimony of self-defense. Other defense witnesses also testified, without objection, that Appellant had injuries after the shootings, and that he consistently told these witnesses he killed two men in self-defense. The jury's verdict rejected Appellant's version of events, even after he swore to it under oath.

¶ 90 We find no reason to believe that Gould's repetition of the self-defense claim through these excluded statements would have altered the outcome. Any error in their exclusion was harmless. We also deny the corresponding claim of ineffective assistance of counsel, as Appellant cannot show any prejudice from defense counsel's failure to more clearly articulate the excited utterance exception. *See* Proposition XI, *infra; Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■■■ ¶ 91 Appellant argues in Proposition VII that the District Court erroneously excluded evidence that Jett and Lynch were affiliated with "notorious motorcycle gangs." Appellant claims on appeal that this evidence was relevant to his flight and his claim of self-defense. Despite the specific ruling Appellant questions here, evidence and inferences of the biker affiliations of Jett and Lynch resound through the testimony and exhibits. Jett was working on a Harley Davidson motorcycle late in the evening in a cluttered house filled with motorcycle tools and parts, pictured in several exhibits. Jett possessed a quantity of methamphetamine and distributed it to people who called on him at home, including Appellant, Tarp, and Katherine Quick. Indeed, Jett's reputation as a reliable drug supplier explains his association with Appellant and Katherine Quick in the first place. The night he was killed, Jett armed himself with a pistol and donned a leather motorcycle vest as he was preparing to leave after receiving a brief cell phone call. Lynch was helping Appellant by sorting motorcycle parts the night he was killed. Lynch had used methamphetamine that night with Jett, Tarp, and Appellant.

¶ 92 Appellant testified Jett and Lynch were bikers. During re-direct examination, defense counsel elicited evidence that the investigating officers referred to Jett as "Biker Bob." Ignoring the District Court's rulings, Appellant intimated the two men's affiliations with the Rogues, Hangmen, and Banditos biker gangs. He told the jury he feared retaliation from bikers after seeing a television broadcast in which Lynch's brother vowed revenge against him. To the extent that the biker connections animated Appellant's fear and explained Appellant's subsequent flight, the District Court admitted more than sufficient evidence. Appellant has failed to show any prejudice from the exclusion of some additional evidence that Jett and Lynch associated with biker gangs. There is no error.

■■■ ¶ 93 Appellant also questions the District Court's exclusion of evidence that police recovered an AR–15 rifle from Jett's bedroom, arguing it corroborated his claim he believed he was still in danger after initially disarming Jett, because he thought Jett was attempting to retrieve this rifle. Reviewing for abuse of discretion, we find none. When defense counsel sought to elicit testimony during the State's case-in-chief that the AR–15 rifle was present in the house, he conceded that Appellant did not know the

rifle was there that night. The District Court properly excluded evidence of the AR–15 in Jett's bedroom when defense counsel failed to show its relevance at the time it was offered on cross-examination. The presence of a firearm of which Appellant was unaware at the time of the killings could have no bearing on the reasonableness of Appellant's belief that the killings were necessary. *Bechtel v. State,* 1992 OK CR 55, ¶ 38, 840 P.2d 1, 12 (right to self-defense is not conditioned on whether danger was in fact imminent, but whether, given the circumstances as defendant perceived them, the defendant's belief was reasonable that the danger was imminent).

¶ 94 Appellant was later allowed to testify to his fear of Jett based on the Easter incident where Jett fired an AR–15 rifle. Appellant also testified that he "thought Bob was in the bedroom getting that AR–15," and that he "thought he went back down through the bedroom, went in his room and got another gun. He had guns all over the house anyway. Every room in that house had a gun in it." In this way Appellant tried to explain why he felt justified in following Jett into the backyard and shooting him again. Appellant can show no abuse of discretion in the District Court's ruling. Proposition VII is denied.

¶ 95 Appellant argues in Proposition VIII that the District Court's exclusion of Defense Exhibits 20 and 21 after the State used portions of the document to impeach Appellant violated due process. After Appellant's direct testimony, the State impeached Appellant with specific inconsistent statements from a transcript of Appellant's tape-recorded interviews with investigators. *See* 12 O.S.2001, §§ 2613, 2801 (a party may impeach a witness with prior inconsistent statements; such out-of-court statements are not hearsay when offered to impeach a witness). The State objected on re-direct examination when defense counsel inquired about other statements made by Appellant during the interview but not mentioned in Appellant's direct testimony. The District Court directed defense counsel to confine the inquiry to prior consistent statements. The Court also told defense counsel he would be permitted

to play any portions of the tape-recorded statements that were consistent with Appellant's trial testimony. Defense counsel ultimately offered to introduce the entire recordings of Appellant's interviews as Defense Exhibits 20 and 21. The District Court sustained the State's objection.

¶ 96 The State might well have offered all of Appellant's statements to police against him as non-hearsay admissions, 12 O.S.2001, § 2801(B)(2)(a), but chose instead to cross-examine him on specific statements that were inconsistent with his trial testimony. Appellant now argues that the District Court's approach made defense counsel's re-direct examination "disjointed" and denied him "the right to fully rehabilitate his credibility and deprived him of a fair trial."

¶ 97 Appellant cannot sustain the contention that he was unfairly limited in presenting his prior consistent statements to police to show the consistency of his story. Appellant's two statements to police, which he sought to admit in their entirety, were lengthy recorded interviews consisting of statements canvassed on direct, cross-examination, and re-direct examination. The playing of these exhibits to the jury would have expended several additional hours of court time. We note initially that even if relevant and admissible, the District Court has discretion to limit testimony and exhibits to avoid a needless presentation of cumulative evidence. 12 O.S.Supp.2004, § 2403. We gather from the record this formed at least part of the rationale for the District Court's ruling. Exculpatory statements made in the same conversation as a confession or admission are admissible to explain the circumstances of the confession. *Crawford v. State,* 1992 OK CR 62, ¶ 17, 840 P.2d 627, 633. However, because the District Court allowed defense counsel sufficient latitude to explore Appellant's prior consistent statements as well as the circumstances of his interview with detectives, Appellant can show no abuse of discretion or prejudice resulting from the exclusion of these exhibits. No relief is required.

## C. Errors in Instructions and Closing Arguments.

¶ 98 In Proposition III, Appellant faults instructional errors and misleading arguments as denying his right to fair consideration of the lesser-included offense of manslaughter. Our cases impose on the District Courts the important duty "to instruct the jury on the salient features of the law raised by the evidence with or without a request." *Hogan v. State,* 2006 OK CR 19, ¶ 39, 139 P.3d 907, 923, *citing inter alia, Atterberry v. State,* 1986 OK CR 186, ¶ 8, 731 P.2d 420, 422. The determination of which instructions are warranted by the evidence remains a matter of trial court discretion. *Omalza v. State,* 1995 OK CR 80, ¶ 52, 911 P.2d 286, 303. Jury instructions are sufficient if when read as a whole they state the applicable law. *Hogan, Id., citing McGregor v. State,* 1994 OK CR 71, ¶ 23, 885 P.2d 1366, 1380. We will reverse the judgment only where an error in the instructions to the jury "has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right." 20 O.S. 2001, § 3001.1; *Phillips v. State,* 1999 OK CR 38, ¶ 73, 989 P.2d 1017, 1038.

¶ 99 Appellant first assigns error in the District Court's decision to administer OUJI–CR 2d 8–50 through 8–53,[11] instructions on the doctrines of the denial of the right to self-defense by an aggressor, withdrawal of an aggressor, the right to self-defense in circumstances of mutual combat, and the fact that menacing words alone are not sufficient to trigger the right of self-defense. Appellant faults the District Court's failure to "tailor" alternatives within the language of the instruction with what he perceives to be the facts of the case on these issues. Appellant preserved this issue by timely objection at trial.

¶ 100 The District Court found among the evidence at trial some testimony to support each of these instructions on the law of self-defense. The evidence and possible inferences about the nature of the *initial* altercation between Appellant and Robert Jett are inherently conflicting, and matters only get more tangled from there. The evidence therefore required important credibility choices by the trier of fact in applying the law of self-defense and lesser-included offenses. Although the State and Appellant championed two competing views of the evidence, the District Court's instructions accounted for a variety of ways jurors may have interpreted the evidence and included proper statements on the law of self-defense in light of those possibilities. The instructions also correctly stated the State's burden to disprove self-defense, and the lesser-included offenses, beyond a reasonable doubt. Appellant has not shown how the instructions, when read as a whole, could have prejudiced his defense at trial. The District Court avoided the very pitfall that has reversed other cases by fully instructing the jury on the law applicable to Appellant's principal defense against the charges, as well

---

11. Appellant objects to following "untailored" versions of the Oklahoma Uniform Jury Instructions–Criminal 2d, given to the jury as Instruction Nos. 22–25:

OUJI–CR 2d 8–50
Self-defense is permitted a person solely because of necessity. Self-defense is not available to a person who was the aggressor or provoked another with the intent to cause the altercation or voluntarily entered into mutual combat, no matter how great the danger to personal security became during the altercation unless the right of self-defense is reestablished.

OUJI–CR 2d 8–51
A person who was the original aggressor or provoked another with intent to cause the altercation or voluntarily entered into mutual combat may regain the right to self-defense if that person withdrew or attempted to withdraw from the altercation and communicated his desire to withdraw to the other participant(s) in the altercation. If, thereafter, the other participant(s) continued the altercation, the other participant(s) became the aggressor(s) and the person who was the original aggressor or provoked another with the intent to cause the altercation or voluntarily entered into mutual combat is entitled to the defense of self-defense.

OUJI–CR 2d 8–52
A person who was not the aggressor or did not provoke another with intent to cause an altercation or did not voluntarily enter into mutual combat has no duty to retreat, but may stand firm and use the right of self-defense.

OUJI–CR 2d 8–53
A person is an aggressor when that person by his/her wrongful acts provokes, brings about, or continues an altercation. The use of words alone cannot make a person an aggressor.

as proper lesser-included offenses. No cause for reversal is shown.

¶ 101 In subproposition III(C), Appellant argues the instructional errors were compounded by prosecutorial misstatements of law in closing argument. The claim is waived by the failure to object. Reviewing the comments for plain error, we reverse only if the comments had "a 'substantial influence' on the outcome," or leave the reviewing court "in 'grave doubt' as to whether it had such an effect." *Simpson v. State*, 1994 OK CR 40, ¶ 36, 876 P.2d 690, 702. Counsel for the State and defense are entitled to a liberal freedom of speech in arguing the facts and competing inferences of the case from their opposing points of view. *Frederick v. State*, 2001 OK CR 34, ¶ 150, 37 P.3d 908, 946; *Bland v. State*, 2000 OK CR 11, ¶ 97, 4 P.3d 702, 728. Reversal is required only where grossly improper and unwarranted argument affects a defendant's rights. *Howell v. State*, 2006 OK CR 28, ¶ 11, 138 P.3d 549, 556, *citing Hanson v. State*, 2003 OK CR 12, ¶ 13, 72 P.3d 40, 49. The prosecutor's arguments offered his interpretation of the evidence and how the jury should apply the instructions of the court. Appellant has shown neither error nor prejudice here. Proposition III is denied.

¶ 102 In Proposition V, Appellant complains that the District Court failed to instruct, *sua sponte*, on the defense of first-degree manslaughter while resisting an attempt to commit a crime. 21 O.S.2001, § 711(3). He also claims ineffective assistance of counsel arising from counsel's failure to request such an instruction. We have previously concluded that the instructions, as a whole, properly stated the applicable law on the crimes alleged and the claim of self-defense presented by the Appellant, as well as the lesser-included offense of heat of passion manslaughter. Notwithstanding his specific complaints in Proposition III, Appellant concedes the District Court correctly gave instructions on his theory of self-defense and first-degree manslaughter in the heat of passion. Reversal on this claim would be appropriate only where Appellant could show the failure to instruct on an additional theory of manslaughter as a lesser-included offense resulted in a miscarriage of justice or the denial of a substantial statutory or constitutional right. 20 O.S.2001, § 3001.1.

¶ 103 In light of the instructions actually given, the jury's verdict found the State disproved Appellant's self-defense claim beyond a reasonable doubt; and rejected the available option of finding Appellant killed Jett and Lynch in a heat of passion provoked by *their* wrongful conduct. Appellant provides no reason to believe that the jury would have found that Appellant killed the two men unnecessarily while resisting their attempt to commit a crime. Any fault the jury might have attributed to Jett and Lynch in bringing about the homicides was insufficient to raise a reasonable doubt that Appellant killed in self-defense, or to reduce the offenses from murder to manslaughter. Additional, *sua sponte* instructions on another form of manslaughter, likewise premised on a finding of wrongful conduct by Jett and Lynch, would not have changed the outcome. This proposition is denied.

¶ 104 Appellant argues in Proposition IX that the District Court's flight instruction violated his state and federal due process rights. Counsel's objection to the instruction at trial preserves this issue for appeal. "This Court has long upheld the giving of flight instructions where the defendant interposed a plea of self-defense or justifiable homicide or testified at trial explaining his departure." *Mitchell v. State*, 1993 OK CR 56, ¶ 7, 876 P.2d 682, 684 (citing more than a dozen cases). Appellant's plea of self-defense and testimony explaining his departure from the scene brings this case within the well-established parameters where the flight instruction has been approved. There is no error.

**D. Challenges to Counsel's First–Stage Assistance.**

¶ 105 In Propositions IV, V, VI, and XI, Appellant claims violations of his right to assistance of counsel under the Sixth and Fourteenth Amendments and Article 2, section 20 of the Oklahoma Constitution. Appellant argues defense counsel performed

deficiently in: (1) eliciting the fact of Appellant's 1982 manslaughter conviction on direct examination, thus waiving all but plain error; (2) failure to object to the prosecutor's misstatements of law and evidence in closing argument; (2) failing to properly articulate the proper exception to the hearsay rule for Appellant's statements to Paul Gould; (4) failure to call a police detective to testify to the biker reputations of Robert Jett and James Lynch; (5) failure to properly utilize available evidence of a 911 call and police reports to impeach the State witness who reported the shooting; (6) failure to utilize available expert testimony and cross-examination to corroborate Appellant's version of events; and (7) failure to use a photograph of Robert Jett's AR-15 to corroborate Appellant's claim that he believed Jett might be going for another weapon. In connection with several of these claims, Appellant has filed a motion to supplement the appellate record and request for evidentiary hearing as permitted by Rule 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S., Ch. 18, App (Supp.2005).

¶ 106 We address these complaints applying the familiar test required by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Ineffective counsel claims must always overcome a strong initial presumption that counsel rendered reasonable professional assistance by showing: (1) that trial counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance. *Spears v. State*, 1995 OK CR 36, ¶ 54, 900 P.2d 431, 445. Courts indulge this presumption of reasonable professional performance primarily due "to the many strategic choices counsel must make in any given case. So long as the choices are informed ones, counsel's decision to pursue one strategy over others is 'virtually unchallengeable.'" *Jones v. State*, 2006 OK CR 5, ¶ 78, 128 P.3d 521, 545, *quoting Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066. To determine whether counsel's performance was deficient, we ask whether the challenged act or omission was objectively reasonable under prevailing professional norms. In this inquiry, Appellant must show that counsel committed errors so serious that he was not functioning as the counsel guaranteed by the Constitution. *Browning v. State*, 2006 OK CR 8, ¶ 14, 134 P.3d 816, 830. The right to effective counsel at trial is not an end in itself, but rather an important means for enforcing the Constitution's guarantee of a fair and impartial trial with a reliable result. Our overriding concern in judging counsel's trial performance is therefore to determine "whether counsel fulfilled the function of making the adversarial testing process work." *Hooks v. State*, 2001 OK CR 1, ¶ 54, 19 P.3d 294, 317.

¶ 107 If Appellant demonstrates that counsel's representation was objectively unreasonable under prevailing professional norms, he must further show that he suffered prejudice as a result of counsel's errors. The Supreme Court in *Strickland* defined "prejudice" as a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial or sentencing would have been different. *Id., citing Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). We will reverse a conviction or sentence only where the record shows that counsel made unprofessional errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S., at 687, 104 S.Ct., at 2064. If the record before us permits resolution of a claim of ineffectiveness on the ground that *Strickland's* prejudice prong has not been satisfied, we will follow this course. *Phillips v. State*, 1999 OK CR 38, ¶ 103, 989 P.2d 1017, 1043. According to these principles, we turn to an examination of Appellant's claims.

¶ 108 Our decision on the admissibility of Appellant's 1982 manslaughter conviction and evidence that he pled self-defense in that case foreshadows the resolution of his first allegation. In Proposition II, we concluded the prior conviction and related evidence were properly admitted and did not amount to plain error. Moreover, Appellant cannot show a reasonable probability that, but for the admission of this evidence, the outcome of the trial would have been different. Appellant cannot show the requisite prejudice under *Strickland*.

¶ 109 For the same reason, counsel's failure to object to alleged misstatements of law and fact in the prosecutor's closing argument requires no relief. Our cases afford counsel for the parties wide latitude during closing argument to discuss the evidence and reasonable inferences. In Proposition III, we reviewed the prosecutor's comments and found no grossly improper or unwarranted arguments amounting to plain error. Even if counsel had objected to the comments, we would not reverse. Appellant therefore cannot show *Strickland* prejudice, and the claim fails. *Weatherly v. State*, 1987 OK CR 28, ¶ 30, 733 P.2d 1331, 1339.

¶ 110 Appellant's claim that counsel rendered deficient performance by failing to make a closing argument in support of the lesser-included offenses is foreclosed by case law recognizing this as an essentially strategic decision. Appellant cannot plausibly claim that counsel made his closing argument without being reasonably informed of the relevant facts; the tactical decision of how to sum up the case for the jury in light of the court's instructions is therefore "virtually unchallengeable." *Jones, supra.* Appellant's unsupported claim that counsel's omission was simple "forgetfulness" is unavailing, because an examination of defense counsel's first-stage closing arguments shows they were objectively reasonable under prevailing professional norms. The often difficult decision of "which defense to stress during closing argument, where both defenses are arguable," is necessarily committed to the strategic judgment of trial counsel, "which we refuse to second guess." *Goulsby v. State*, 1987 OK CR 184, ¶ 13, 742 P.2d 567, 572. We will not reverse on this ground.

¶ 111 Appellant has filed an application to supplement the appellate record and requested remand for an evidentiary hearing in connection with his claims that trial counsel failed to call a police detective to testify to the biker reputations of Robert Jett and James Lynch; failed to properly utilize a 911 call and police reports to impeach the State witness who reported the shooting; failed to utilize available crime scene evidence and expert testimony to corroborate Appellant's version of events; and failed to admit a photograph of Robert Jett's AR–15 to corroborate Appellant's claim that he believed Jett might be going for another weapon.

¶ 112 Under Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S., Ch. 18, App. (Supp.2005), this Court reviews the affidavits and evidentiary materials submitted by Appellant to determine whether the application sets forth "sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." If the Court determines from the application that a strong possibility of ineffectiveness is shown, we will "remand the matter to the trial court for an evidentiary hearing, utilizing the adversarial process, and direct the trial court to make findings of fact and conclusions of law solely on the issues and evidence raised in the application." Rule 3.11(B)(3)(b)(ii). The evidentiary record thus created in the District Court may then be admitted as part of the record on appeal and considered in connection with Appellant's claims of ineffective counsel. Rule 3.11(B)(3) and (C).

¶ 113 After careful consideration of each of Appellant's claims in light of both the evidence offered at trial and materials submitted in support of his Rule 3.11 application, the Court finds that Appellant has not shown clear and convincing evidence suggesting a strong possibility that trial counsel was ineffective in the acts or omissions challenged here. Imaginative criticisms of trial counsel's performance issue all too readily from the gainful vantage of a zealous hindsight. These criticisms fall short of impeaching a trial performance that, if less than perfect, was both skillful and spirited. Appellant has not shown the strong possibility that counsel's alleged errors resulted in a breakdown of the adversarial process so serious that the trial cannot be deemed to have produced a reliable result. *Scott v. State*, 2005 OK CR 3, ¶ 7, 107 P.3d 605, 607; *Short v. State*, 1999 OK CR 15, ¶ 96, 980 P.2d 1081, 1109. Appellant's request to supplement the record and remand for evidentiary hearing under Rule 3.11 is denied.

### III. CHALLENGE TO NON-CAPITAL CONVICTION.

¶ 114 In Proposition X, Appellant claims his conviction in Count 4, possession of a firearm after former conviction of a felony, violates 21 O.S.2001, § 11, and the constitutional prohibitions against double jeopardy. U.S. Const. amend. V, XIV; Okla. Const. art. II, § 21. It is beyond doubt that Appellant unlawfully took the pistol into his possession at Robert Jett's house in Oklahoma City in April, 2001, and that he was arrested while in possession of the same weapon in Logan County almost six months later. In 2002, Appellant entered a guilty plea in the District Court of Logan County and received ten (10) years imprisonment for his felonious possession of the pistol. Before his 2004 trial in Oklahoma County, Appellant pled former jeopardy to Count 4 and moved for dismissal. The District Court overruled the motion to dismiss. Appellant has preserved the issue for review.

¶ 115 The issue before us is one of first impression for an offense under 21 O.S.2001, § 1283. However, "[i]t appears to be a well-settled proposition in felon-in-possession cases that the element of possession implies continuity." *Simmons v. State,* 899 P.2d 931, 936 (Alaska Ct.App.1995). Criminal possession "may be brief, if complete, or it may extend over a period of time, if uninterrupted." *State v. Williams,* 211 Neb. 650, 319 N.W.2d 748, 751–752 (1982) (possession of a firearm, absent evidence of interruption, was a single offense). Felonious possession of a firearm "is a course of conduct, not an act; by prohibiting possession Congress intended to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in a firearm." *United States v. Jones,* 533 F.2d 1387, 1391 (6th Cir.1976). A continuing course of conduct defined by statute as a single crime cannot be charged as multiple crimes occurring at discrete moments in time. *Id.* When defendant is charged "with multiple counts alleging possession of the same weapon on different occasions, the State must bear the burden of proving that the defendant's possession was not continuous … be-yond a reasonable doubt." *Simmons,* 899 P.2d at 936.

¶ 116 In *United States v. Jones, supra,* the Government charged the defendant in three counts of felonious possession of the same firearm on three different occasions over a three-year period. 533 F.2d at 1390. The Government there argued each act of possession was punishable as a separate offense. The Court of Appeals disagreed:

> With equal propriety the Government might have charged Jones with possession on more than 1100 separate days and obtained convictions to imprison Jones for the rest of his life. The fact that the Government merely has proof that he possessed the same weapon on three separate occasions, rather than continuously for a three-year period, should not dictate the result that Jones could receive three times the punishment he would face if continuous possession for a three year period were proved. There is no proof that there was any interruption in the possession by Jones of the weapon.

*Id.* at 1391. The Court of Appeals found defendant's conviction and punishment for three counts of felonious possession of the same firearm violated the Fifth Amendment prohibition against double jeopardy.

¶ 117 In the District Court, the State argued that Appellant's possession of the weapon in Oklahoma County and Logan County were separated by several months and thus separate offenses. Under these particular facts, we disagree. The evidence of Appellant's felonious possession of the firearm in Oklahoma County in April, 2001, and again in Logan County in October, 2001, raises a sufficient inference, in the absence of any contrary evidence, that Appellant continuously exercised dominion and control over the weapon, so that his possession of it was one ongoing violation of section 1283. Jeopardy attached upon Appellant's conviction and punishment for felonious possession of the weapon in the Logan County District Court. *Dyer v. State,* 2001 OK CR 31, ¶ 4, 34 P.3d 652, 653. The conviction and punishment by the District Court of Oklahoma County in Count 4 placed Appellant twice in jeopardy for the same offense in violation of Article II,

Section 21 of the Oklahoma Constitution and the Fifth and Fourteenth Amendments. The conviction is reversed.

## IV. CHALLENGES TO CAPITAL SENTENCES.

¶ 118 Appellant interposes several challenges to the death sentences in Propositions XII and XIII. He first argues the evidence is insufficient to prove the aggravating circumstance that the murders were especially heinous, atrocious, or cruel. 21 O.S. 2001, § 701.12. The proper test of evidentiary sufficiency for an aggravating circumstance under the Eighth and Fourteenth Amendments is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *Jones v. State,* 2006 OK CR 10, ¶¶ 4–5, 132 P.3d 1, 2 (Opinion on Rehearing); *Powell v. State,* 1995 OK CR 37, ¶ 3, 906 P.2d 765, 784 (Opinion on Rehearing); *see also, Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

¶ 119 The District Court instructed the jury that to prove the murders were especially heinous, atrocious, or cruel, the State must establish beyond a reasonable doubt that "that the murder was preceded by either torture of the victim or serious physical abuse" and "that the facts and circumstances of this case establish that the murder was heinous, atrocious, or cruel." The District Court defined torture as "either great physical anguish or extreme mental cruelty," requiring a finding "that the victim experienced conscious physical suffering prior to his death." The District Court defined murder as "heinous" only when it is "extremely wicked or shockingly evil"; "atrocious" when it is "outrageously wicked and vile;" or "cruel," when it is "pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others." *See* OUJI–CR (2d) 4–73; *DeRosa v. State,* 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1156.

¶ 120 In the light most favorable to the State, the evidence showed that Robert Jett suffered four bullet wounds (likely caused by three bullets), including three painful, non-fatal wounds to the arm, flank, and knee. After shooting twice at Jett in the house, Appellant said "I just killed you, bitch." Jett realized his injuries and said "Yea, you did." Jett ran from his home after these first shots in a doomed attempt to escape the shooter. He fell wounded in the back yard, where he moaned and writhed in pain. He spoke his last words—"I'm going to die"—to his killer, and received Appellant's pitiless confirmation, "Yes, you are." Appellant then delivered another round from the pistol. Jett was still alive, moaning and unable to speak, when police found him several minutes later. The evidence is sufficient to support the jury's finding that Jett's murder was especially heinous, atrocious, or cruel. *Phillips v. State,* 1999 OK CR 38, ¶¶ 82–84, 989 P.2d 1017, 1039 (finding defendant's taunting of victim after infliction of fatal wound showed pitiless attitude of killer and nature of the crime).

¶ 121 Again, viewing the evidence and inferences tending to support the jury's verdict, James Lynch did not die instantly, but suffered painful gunshot wounds to his face and hand in addition to the fatal wound to his lower chest. A bullet struck his hand and then entered his cheek as he tried to cover his face or deflect a shot he believed imminent. Lynch witnessed the shooting of his friend; was unarmed throughout the confrontation; and was shot down while attempting to help his friend when Appellant came up with Jett's pistol and began to fire. Lynch, obese, in poor health, and physically limited, was no threat to Appellant. Appellant fired the last round at Lynch while he lay wounded on the floor. The evidence is sufficient to support a conclusion that Lynch also consciously suffered "great physical anguish or extreme mental cruelty" inflicted by Appellant. *Robinson v. State,* 1995 OK CR 25, ¶ 41–45, 900 P.2d 389, 401–402. We will not reverse the jury's finding here.

¶ 122 Appellant next challenges the admission of evidence supporting the continuing threat aggravating circumstance and deems this aggravating circumstance constitutionally overbroad. He also questions whether the jury instructions on this aggra-

vating circumstance properly limit the sentencer's discretion as required by the Eighth Amendment. *See* OUJI–CR (2d) 4–74. Appellant objects that the State relied for this aggravating circumstance on Appellant's prior manslaughter conviction and other non-violent felonies, his involvement with drugs, and his escape from the Logan County jail. We note the jury also heard evidence that Appellant possessed weapons and committed a violent assault on another inmate while in jail. On the whole, this evidence was proper. *Bland v. State,* 2000 OK CR 11, ¶ 76, 4 P.3d 702, 723; *Malone v. State,* 1994 OK CR 43, ¶ 38, 876 P.2d 707, 717. We have consistently rejected overbreadth challenges to the continuing threat aggravating circumstance and the uniform jury instruction defining it. *Williams v. State,* 2001 OK CR 9, ¶ 78, 22 P.3d 702, 722. The evidence supporting this aggravating circumstance is more than sufficient. *Myers v. State,* 2006 OK CR 12, ¶ 87, 133 P.3d 312, 333–334.

¶ 123 Appellant also challenges the admission of victim impact testimony from witnesses not authorized to give evidence under the statute. The State called Robert Jett's brother, and James Lynch's brother and sister, as victim impact witnesses. Without objection, Lynch's brother and sister each read prepared statements from Lynch's nephew and niece about the impact of his death. The victim impact statute limits those persons who may offer victim impact testimony to "immediate family," i.e., a spouse, child by birth or adoption, a stepchild, a parent, or a sibling of each victim. 22 O.S.2001, §§ 984(2), 984.1(A). Counsel waived the limitations of the statute by failure to object to the statements from the niece and nephew of James Lynch. *Lott v. State,* 2004 OK CR 27, ¶ 108, 98 P.3d 318, 346. We find no plain error because the evidence presented by these witnesses complied with the limitations of statute and case law. *Id.* at ¶ 113, 98 P.3d at 347–348; 22 O.S.2001, § 984(1). Appellant also complains for the first time on appeal that the admission of an in-life photograph of James Lynch was error. This issue is waived. Such evidence is specifically permitted by 12 O.S.Supp.2004, § 2403. There is no plain error. For the same reason, Appellant suffered no prejudice from counsel's failure to object to the victim impact and photographic evidence under *Strickland.*

¶ 124 In Proposition XIII, Appellant seeks reversal or modification based on the cumulative effect of the District Court's errors. We found the conviction in Count 4 was barred by former jeopardy. That conviction is reversed with instructions to dismiss. There is no accumulation of error resulting in prejudice to Appellant's rights. No further relief is required. *Short, supra,* at ¶ 97, 980 P.2d at 1109.

## V. MANDATORY SENTENCE REVIEW.

¶ 125 This Court must determine in every capital case: (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of the aggravating circumstances. 21 O.S.2001, § 701.13(C). The jury found that Appellant was previously convicted of a felony involving the use or threat of violence to the person; Appellant knowingly created a great risk of death to more than one person; the murders were especially heinous, atrocious, or cruel; and the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.2001, § 701.12(1), (2), (4), and (7).

¶ 126 We rejected Appellant's challenge to the evidentiary sufficiency of the "especially heinous, atrocious, or cruel" aggravating circumstance. Appellant's prior conviction of a felony involving the use or threat of violence to the person is undisputed. The "great risk of death to more than one person" and "continuing threat" aggravating circumstances are also shown by sufficient evidence. *Davis v. State,* 1995 OK CR 5, ¶ 11, 888 P.2d 1018, 1021 (shooting and killing multiple victims in single attack supported "great risk of death" aggravating circumstance); *Short,* 1999 OK CR 15, ¶ 100, 980 P.2d 1081, 1109–1110 (a finding that the defendant would commit criminal acts of violence that would constitute a continuing threat to society is shown by evidence that defendant participated in unre-

lated criminal acts and crime exhibited calloused nature of the defendant).

¶ 127 Appellant countered the evidence in aggravation with evidence and argument of nineteen mitigating circumstances summarized in the instructions to the jury, embracing his family life and work history; his abusive birth father and the premature loss of a loving step-father; his caring relationship with a profoundly disabled brother; his kindness and charity to other disadvantaged and disabled people; his lack of psychopathology or mental illness; and his low risk of future violence in a structured environment. Upon a careful review of this record, we cannot say the jury was improperly influenced by passion, prejudice, or any other arbitrary factor, in finding that the aggravating circumstances outweighed the mitigating evidence and called for the ultimate sanction.

## DECISION

¶ 128 The Judgment and Sentence of the District Court of Oklahoma County in Counts 1 and 2 is **AFFIRMED.** Count 4 is **REVERSED** and **REMANDED** with instructions to dismiss. Pursuant to Rule 3.15, Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2005), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, V.P.J. and A. JOHNSON, J.: concur.

CHAPEL, P.J.: concurs in results.

LUMPKIN, P.J.: concurs in part/dissents in part.

LUMPKIN, Presiding Judge: concur in part/dissent in part.

¶ 1 I concur in the affirmance of the judgments and sentences in Count 1 and 2, but dissent to the reversal in Count 4. I write separately to address certain points.

¶ 2 In section B of the opinion, Rulings on the Admissibility of Evidence, I would direct the reader's attention to *Simpson v. State,* 1994 OK CR 40, ¶ 11, 876 P.2d 690, 695 for the proposition that the failure to raise a timely objection to the admission of evidence waives appellate review for all but plain error

review. Also in Proposition II, I note that in *Beck v. State,* 1991 OK CR 126, ¶ 15, 824 P.2d 385, 389 we looked to the common law as well as the Evidence Code for the rules and procedures in admitting evidence of prior convictions.

¶ 3 In Proposition III, I agree with the Court that once properly raised the State has the burden to disprove self-defense. However, as the Court recognizes, the State does not have the burden to disprove any lesser included offenses. The State's burden is to prove beyond a reasonable doubt each element of any lesser included offenses before the defendant can be convicted of a lesser included offense. *See Oklahoma Uniform Jury Instructions Criminal* (2d) 10–24.

¶ 4 In Proposition X, I find Appellant's conviction in Count 4 was not barred by double jeopardy. Appellant possessed the weapon on different dates in different counties. Criminal charges could lawfully be brought in both counties, as venue of the crime is a different element in each prosecution. As these were two separate offenses, jeopardy did not attach upon Appellant's conviction in Logan County and his conviction in Oklahoma County was not in violation of the prohibition against double jeopardy. Accordingly, I would affirm the conviction in Count 4.